IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

```
KELLI ROWLETTE, an          )
individual, SALLY ASHBY, an )
individual, and HOWARD      )
FOWLER, an individual,      )
                            )  Case No. 4:18-cv-143-DCN
          Plaintiff,       ,)
                            )
                            )  Pocatello, Idaho
     vs.                    )  August 30, 2018
                            )  2:00 p.m.
GERALD E. MORTIMER, M.D.,   )
LINDA G. McKINNON MORTIMER, )
and the marital community   )
comprised thereof, and      )
OBSTETRICS AND GYNECOLOGY   )
ASSOCIATES OF IDAHO FALLS,  )
P.A., an Idaho professional )
corporation,                )
                            )  Motion Hearing
          Defendants.       )
_____)
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DAVID C. NYE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs:

              SHEA C. MEEHAN, ESQ.
              JILLIAN HARLINGTON, ESQ.
              Walker Heye Meehan & Eisinger, PLLC
              1333 Columbia Park Trail, Suite 220
              Richland, WA 99352
              509-735-4444


Appearances continued on Page 2.

Court Reporter:  Katherine Eismann, CRR, RDR
                 katherine_eismann@id.uscourts.gov

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1    Appearances continued:

2    For the Defendants Gerald E. Mortimer, M.D. and Linda G.
     McKinnon Mortimer:

3
               RAYMOND D. POWERS, ESQ.
4              PORTIA L. RAUER, ESQ.
               Powers Tolman Farley, PLLC
5              702 West Idaho Street, Suite 700
               Boise, ID 83702
6              208-577-5100

7    For the Defendant Obstetrics & Gynecology Associates of Idaho
     Falls, P.A.:

8
               RICHARD R. FRIESS, ESQ.
9              Thomsen Holman Wheiler, PLLC
               2635 Channing Way
10             Idaho Falls, ID
               208-522-1230

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Thursday, August 30, 2018, 2:00 p.m.)

2                  --oOo--

3              P R O C E E D I N G S

4           THE COURT:  Please be seated.

5           COURTROOM DEPUTY:  Court will now hear the motions

6 hearing in Case Number 4:18-cr-143-DCN, Rowlette, et al.,

7 versus Mortimer, et al.

8           THE COURT:  Good afternoon.  Counsel, I know I have a

9 roll call, but if you would -- or I have a sheet.  If you would

10 just tell me who each of you are and who's going to be doing

11 the arguments, I would appreciate it.

12               It's your motion, so let's start with you.

13           MR. RAUER:  Thank you, Your Honor.  I am Portia

14 Rauer.  I will be doing the argument on behalf of the Mortimer

15 defendants.

16           THE COURT:  Okay.

17           MR. POWERS:  Ray Powers on behalf of the Mortimers,

18 Your Honor.

19           MR. FRIESS:  Richard Friess on behalf --

20           THE COURT:  Mr. Powers, I can't believe you are going

21 to sit quiet.  I've never seen that yet.

22           MR. POWERS:  I am, Your Honor.

23           THE COURT:  Okay.

24           MR. FRIESS:  Richard Friess on behalf of the

25 defendant Obstetrics and Gynecology Associates of Idaho Falls.

1  Your Honor, I'll be doing a brief argument for OGA.

2          THE COURT:  All right.  And then from the plaintiff's

3  side.

4          MR. MEEHAN:  Your Honor, Shea Meehan here on behalf

5  of plaintiffs, Kelli Rowlette, Howard Fowler and Sally Ashby.

6  And I will be arguing today.

7          THE COURT:  And they are here?

8          MR. MEEHAN:  They are present at the table behind me,

9  Your Honor.

10          THE COURT:  Okay.

11          MS. HARLINGTON:  And Your Honor, Jillian Harlington

12  here for plaintiffs as well.

13          THE COURT:  All right.  Thank you.  I believe my law

14  clerk has already spoken to you.  Each side's going to have --

15  well, each party will have 20 minutes.  You can save whatever

16  you want for rebuttal, but I leave it up to you to determine

17  how much time to save.

18          Mr. Friess, I'm not going to give you the full 20

19  minutes.

20          MR. FRIESS:  I don't anticipate on taking it, Your

21  Honor.  Thank you.

22          THE COURT:  All right.  And then plaintiffs will also

23  have 20 minutes to respond, if -- depending on how much

24  Mr. Friess goes, I might give you a little extra.

25          MR. POWERS:  Thank you, Your Honor.

1          THE COURT:  Okay.  So, let's go ahead and get

2     started.

3          MR. RAUER:  May it please the Court and counsel.  I'd

4     like to begin my argument with a brief review of the standard

5     that this motion is to be decided under, not so much for the

6     benefit of the Court and counsel, but more so for the benefit

7     of those in the audience that may not be aware of how the

8     motion to dismiss works in this forum.

9          As Court and counsel are aware, the standard of

10    review for a motion to dismiss is that all of the facts, as

11    alleged in the complaint, are to be construed as true and

12    accurate.  That's the basis for the arguments set forth, and

13    the Court is to decide those; whether the plaintiffs have

14    sufficiently pled their allegations to support a claim upon

15    which relief can be granted.

16         There are no facts from the outside that are going to

17    be brought in and the decision is to be made based on what has

18    been alleged within the four corners of the complaint.  Now --

19         THE COURT:  Just so you and I are clear, I believe

20    you've filed an answer, but you are not asking me to look at it

21    for purposes of this motion; correct?

22         MR. RAUER:  Correct.  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MR. RAUER:  From the answer, you can -- you can see

25    that we do disagree with the allegations.  But as we are

1    required to do, under a motion to dismiss, the arguments that I

2    will make and the arguments that we have made in our briefing

3    are on the assumption that all of the allegations, as contained

4    in the complaint, are true as stated and from that we move

5    forward with our arguments.

6         There are numerous reasons in this case why all of

7    the plaintiffs' claims should be barred.  Kelli Rowlette,

8    Howard Fowler do not have standing to bring claims.  They have

9    not shown, within the four corners of the complaint, where

10   there is a duty established between them and Dr. Mortimer in

11   order for their claims to proceed.

12        Each cause of action that they've alleged is barred

13   by the statute of limitations.  Even if the Court were to

14   consider that statute of limitations may or may not apply, the

15   gravamen analysis applies to preclude a variety of their

16   claims; for example, fraud, battery, breach of contract, the

17   emotional distress claims, the violation of the Consumer

18   Protection Act.

19        Those claims are precluded as stand-alone claims

20   because of the gravamen analysis, which stands for the

21   proposition that if the cause of action arises from the

22   provision of healthcare, that the act is considered to be in

23   malpractice.  It's not breach of contract, battery --

24        THE COURT:  What happens --

25        MR. RAUER:  -- et cetera.

1          THE COURT:  -- if I decide that father and daughter

2     don't have standing for medical malpractice?  Can they still

3     bring a fraud action then?

4          MR. RAUER:  No.

5          THE COURT:  Why not?

6          MR. RAUER:  Because they don't -- they don't stand

7     in -- depending on which -- which of those causes of action you

8     want to look at.  We'll take Kelli Rowlette for example.  As we

9     have argued in our briefing, she wasn't even born when the

10    cause of action arose.  So, there can't be any claims that she

11    can bring forward, because she was not even alive at the time

12    the alleged misconduct took place.  So, she doesn't have

13    standing to bring any of the other claims.

14          The cause of -- the causes of action arose from the

15    rendering of the medical care.  Mr. Fowler was not the patient.

16    Mr. Fowler did not have the physician/patient relationship with

17    Dr. Mortimer.

18          THE COURT:  But in a fraud case, it arose from the

19    doctor duping them about who would be the source.  That has

20    nothing to do with practicing medicine.

21          MR. RAUER:  Well, I believe that if you look at the

22    allegations in the -- in the complaint, and then you overlay

23    the requirements for pleading fraud, nine elements of fraud

24    that they must -- they must prove, and they must prove their

25    damage.  And we believe that this is a very unique case.

1          THE COURT:  That's a whole nother problem, yes.  I

2   see that.

3          MR. RAUER:  Certainly.  But at the end of the day,

4   they have to show that they've been damaged by this alleged

5   misconduct.  And they haven't articulated any damage upon which

6   relief can be granted as set forth in the four corners of their

7   complaint.

8          They've alleged no physical symptoms whatsoever.  And

9   on that basis, if they don't have any damages, then why are we

10  here today?  And that's one of the arguments that -- that we've

11  made.  That they have to have some damage that can be causally

12  linked to their allegations of misconduct against Dr. Mortimer.

13         THE COURT:  What about back again on a fraud claim?

14  It doesn't have to be injury to the party physically.  What

15  about the fact that they paid money for a particular service

16  and they didn't get what they paid for?  Isn't that damage?

17         MR. RAUER:  Well, I'd like to address those -- your

18  questions about whether or not those causes of action survive.

19  So, if we look at those other causes of action, the negligence

20  aside.  If we look at fraud, for example, there is a statute of

21  limitation for fraud.  And it doesn't have a discovery rule

22  embedded in it.

23         They are 37 years -- 35 years too late to bring a

24  fraud action because of the elements that they must plead, the

25  elements that they must prove.  And the case law is clear under

1  *Hoover versus Hunter* that when you have a claim for medical
2  malpractice and a fraud claim, the medical malpractice case --
3          THE COURT:  But they don't have a medical
4  malpractice.  That goes --
5          MR. RAUER:  If -- if they don't have a medical
6  malpractice case, they still have to establish that they have
7  complied under the statute of limitations and they have to
8  demonstrate their damage.  And they have to demonstrate that --
9  that there was some type of justifiable reliance on the
10  representations that were made in whatever context we are going
11  to talk about.
12          THE COURT:  That would be true --
13          MR. RAUER:  And the law --
14          THE COURT:  I am sorry to keep interrupting, but that
15  would be true whether it was fraud or breach of contract;
16  right?
17          MR. RAUER:  Well, I think that fraud and breach of
18  contract are distinctly different enough that they shouldn't be
19  blended.
20          THE COURT:  Okay.
21          MR. RAUER:  If we are just talking about the fraud
22  allegations, we have to keep in mind that the agreement with
23  the plaintiffs and Dr. Mortimer was that the donor would be
24  anonymous.  He doesn't have a duty or any responsibility to
25  identify the donor if their agreement was that we don't want to

1  know who the donor is.

2         And I know that there has been some -- some briefing

3  about that.  And in plaintiffs' opposition, they added an

4  additional claim or an additional allegation that was not

5  included in their complaint by claiming "Oh, that anonymity was

6  to run two directions."

7         They didn't plead that.  There is nothing in the four

8  corners of their complaint that says that the Fowlers, as

9  recipients of the donor semen, are to remain anonymous to the

10  donor.  There is no allegation.  And based under the standard

11  of review, under a motion to dismiss, the Court's not to

12  consider that argument.  It hasn't been pled.  It hasn't been

13  alleged.

14         So, we are left with how they pled their complaint.

15  And their complaint clearly pleads that the donor was to be

16  anonymous.  And if you look at the *Merriam-Webster* definition

17  of anonymous, it's an adjective that modifies the noun that

18  precedes it.  And anonymous means unnamed or unknown,

19  unidentified.

20         And Dr. Mortimer -- if we construe the facts in the

21  light most favorable to the plaintiffs, Dr. Mortimer agreed to

22  keep the donor anonymous.  He wasn't going to reveal the

23  identity of the donor.  And therein lies the problem that the

24  plaintiffs have with establishing the fraud claim.

25         THE COURT:  Except that anonymous wasn't the only

1 thing that the plaintiffs claim was part of that.  They also

2 claim that the donor would meet certain requirements; height,

3 color of hair, eyes.  I don't know if he did or didn't.  I have

4 no idea.  But is that going to be an issue on this motion?

5         MR. RAUER:  No, I don't think that it is going to be

6 an issue, because we are looking at just what's in the four

7 corners of the complaint.  And the plaintiffs didn't allege

8 that their daughter doesn't have those characteristics.  They

9 don't claim that she's blond with green eyes, 5-foot-5, and

10 lacks a college education.  They don't make the claim that she

11 didn't fit those criteria.  There is no allegation that the

12 criteria wasn't met with her.

13         THE COURT:  And does it have to be her or could it

14 have been that the doctor didn't meet those qualifications?

15         MR. RAUER:  It's our position, Your Honor, that they

16 needed to set forth that the agreement was breached or the

17 fraud was -- was imposed upon them, because this child that

18 they wanted didn't meet those characteristics.

19         Because they -- they plead that they wanted these

20 certain characteristics.  They don't say that she doesn't have

21 them.  She's here present in court today --

22         THE COURT:  Nor do they say --

23         MR. RAUER:  -- and we can see for ourselves.

24         THE COURT:  If I remember correctly, they don't say

25 whether or not they had them.  So, I don't know who -- whose

1    genes took and whose didn't.

2         MR. RAUER:  Right.  That's exactly correct, Your

3    Honor.  And as -- as we know, we've got to stick within the

4    four corners.  I mean, we can -- we all spent three days

5    together in depositions, and certainly we have a lot more

6    information.  But I want us to stay focused on what's pled

7    within the four corners of that complaint.

8         And if we stick on the fraud for a few moments, Your

9    Honor, the plaintiffs identify and allege, in their complaint,

10   that they wanted to keep this -- this knowledge from their

11   daughter.  The Fowlers didn't want to tell their daughter about

12   the circumstances of her conception.  They chose to keep that

13   from her.  They chose to conceal it from her.

14        So, if we are going to go down the fraud analysis, it

15   necessarily has to include those allegations that they come to

16   this argument with their own concealment, if you will, from

17   their own daughter.

18        THE COURT:  Well, I understand what you are saying,

19   what you are arguing, but I don't buy it.  I think closed

20   adoptions, closed inseminations, that was pretty common back

21   then.  I don't have a problem with it, but -- but I understand

22   your argument.

23        MR. RAUER:  You had mentioned the breach of contract

24   scenario.  The statute of limitations is very clear on breach

25   of contract.  It is when the breach occurs.  There is no

1   discovery rule, and we provided you with case law to support

2   that.

3           So, that claim, it's either out on statute of

4   limitations, because it's very clear; or it's precluded in the

5   gravamen analysis if we are to consider the medical malpractice

6   claim.

7           THE COURT:  Okay.

8           MR. RAUER:  Battery is very similar, Your Honor.  The

9   statute is very clear that it is two years from the occurrence.

10  There is no tolling of the statute of limitations.

11          THE COURT:  I agree.  I don't think you need to waste

12  your time on battery, because I think the only one that could

13  have a battery claim is the mother, and that clearly would get

14  consumed in the medical malpractice.  So, you don't even have

15  to go down the statute of limitations on that one.

16          MR. RAUER:  Okay.  If we look to the emotional

17  distress claims, there's case law to support our position that

18  the claims of emotional distress are part and parcel of a

19  medical malpractice action.

20          And to demonstrate that their emotional distress is

21  so severe as to be actionable, they must have pled a physical

22  manifestation of their emotional distress.  And as I mentioned

23  earlier, there are no allegations of any kind of physical harm,

24  physical symptoms whatsoever.  So, their emotional distress

25  claims are part and parcel of the medical malpractice claim.

1          The violation of the Consumer Protection Act, again,

2     is another statute -- statute of limitations issues.  It's two

3     years, and there's case law supporting position that you can't

4     have two kinds of claims.  If you have a medical malpractice

5     claim and the cause of action arises from the provision of

6     medical care, then a cause of action for the violation of the

7     Idaho Consumer Protection Act is part and parcel of the medical

8     malpractice action.

9          We believe that the medical malpractice, in this

10    case, and the informed consent issues are also barred by the

11    statute of limitations.  And it goes to the -- the fraudulent

12    concealment exception in the 5-219(4).  Fraudulent concealment

13    is the only exception that applies.  Idaho does not have a

14    discovery rule.  It's not about when you discover the harm.

15    It's about -- it's about when it was objectively ascertainable.

16         The exception to the two-year statute is the

17    fraudulent concealment.  And again, we go back to the anonymous

18    donor.  That was the agreement; that the plaintiffs didn't want

19    to know who the donor was.  That's what's in the four corners

20    of their complaint.  The fraudulent exception doesn't apply, so

21    the statute of limitations takes over and their claim is just

22    too late.

23         We understand that dismissing these claims is a harsh

24    result.  The Supreme Court addressed harsh results in medical

25    malpractice actions when plaintiff's causes of action are

1   dismissed and said, "You know, maybe -- maybe it's a harsh

2   result, but that's a legislative issue.  It's not for the Court

3   to take care of."

4           This claim of these plaintiffs is over 35 years old.

5   The statute of limitations has run on their claims.  And this

6   is a unique situation, Your Honor.  This isn't -- this isn't a

7   situation where we have a set of plaintiffs who are claiming

8   physical harm from this alleged malpractice claim.

9           They are not claiming that I have a perforated bowel

10  because of the insemination process.  That my uterus was

11  damaged, and I couldn't have a child, or that I became

12  pregnant, had a child, but my child has birth defects.

13          They haven't claimed that because of the actions of

14  Dr. Mortimer, as they've alleged in their complaint, that they

15  don't want their daughter Kelli.  That they'd send her back to

16  Dr. Mortimer.

17          They wanted a child.  They pursued artificial

18  insemination to achieve conception of a child.  They received a

19  child.  And there are no allegations in the complaint where any

20  of the plaintiffs have claimed, "We didn't want this child.  We

21  are disowning this child.  This child was damaged because of

22  some alleged misconduct."  Nor is there allegations that

23  Ms. Rowlette is claiming that she wished she wasn't alive.

24          As we've argued in our briefing, when you distill

25  down the gravamen of the causes of action, it looks more like a

1    wrongful life claim.  "I shouldn't be here" -- if I'm

2    Ms. Rowlette, "I wouldn't be here had it not been for the

3    wrongful conduct we allege by Dr. Mortimer."

4           Wrongful life cases are not recognized in Idaho.  And

5    it is our opinion that the sanctity of Miss Rowlette's life

6    should be honored here, and this case should be dismissed in

7    its entirety, because something positive came from this.  This

8    is -- this is a procedure that they wanted.  They wanted a

9    child.  They received a child.  And that's been a positive

10   thing for them.

11          They haven't claimed in their complaint that this was

12   a miserable childhood, and it's been a miserable time raising

13   this child.  And had they known it was Dr. Mortimer's, they

14   certainly would have made different choices and not accepted

15   this child into their lives.  That's the kind of damage that's

16   required in this type of action in order for these causes of

17   action to move forward.

18          Plaintiff has claimed that all of our arguments on

19   statute of limitations and the gravamen analysis are erased by

20   an equitable estoppel argument.  That doctrine simply doesn't

21   salvage the causes of action, because they can't claim that

22   they were prejudiced.

23          If we only look at one element in the equitable

24   estoppel list of four, I believe, they can't -- they can't meet

25   their burden on the fourth element, which is they were

1    prejudiced somehow by this misrepresentation.  They haven't

2    alleged that they were prejudiced by having this child in their

3    life, that -- that they've now learned that wasn't fathered by

4    Mr. Fowler.  If there's no prejudice, there can be no equitable

5    estoppel to bump their causes of action.  And if there isn't

6    anything to salvage their claims, they must be dismissed under

7    statute of limitations law, and they must be dismissed because

8    they are precluded by the gravamen analysis any way you slice

9    it.

10            If you look at it by the claims of Kelli and Howard,

11   they don't have standing.  If you look at it from statute of

12   limitations and the preclusion doctrines, none of the causes of

13   action survive.

14            Before I -- before I take my seat, Your Honor, I also

15   want to mention the claims against Mrs. Mortimer.  I don't want

16   to spend a great deal of time on that, but they've alleged

17   nothing about Mrs. Mortimer's conduct.  She had no duty.  She

18   was not there.

19            THE COURT:  Maybe I can save you some time.  Unless

20   they give me a very good argument as to why she should stay in,

21   she won't.

22            MR. RAUER:  And that's our position, Your Honor, that

23   she should not stay in.  They have not properly --

24            THE COURT:  Save that for rebuttal, and let's see

25   what happens.

1          MR. RAUER:  Thank you.  I have made my arguments,

2     Your Honor.  I think that the salient points have been -- have

3     been discussed.  As I mentioned, we believe that all of the

4     claims should be dismissed in their entirety.

5          There isn't anything that saves these claims.  They

6     are either -- they are either barred by the statute of

7     limitations or they are precluded by the gravamen analysis, and

8     the case should be dismissed in its entirety if for no other

9     reason they haven't pled any damages.  They wanted a child, and

10    they received a child.

11         THE COURT:  Thank you.

12         MR. RAUER:  Thank you, Your Honor.

13         THE COURT:  Mr. Friess.

14         MR. FRIESS:  Thank you, Your Honor.

15         May it please the Court.  We represent the current

16    owners of Obstetrics and Gynecology of Idaho Falls, PA.  I

17    think it's important to note and for the Court's information

18    moving forward, that the conduct alleged in the complaint

19    occurred well before the current owners and physicians of OGA

20    were associated or involved with OGA.

21         Having said that, I won't take up too much of the

22    Court's time.  I want to discuss briefly -- the Court was

23    questioning Ms. Rauer about Mrs. -- Mr. Fowler's fraud claim.

24         I think another avenue or another analysis that needs

25    to be brought forward to the Court is the language of Idaho

1    Code Section 6-1012.

2              6-1012 is the statute that the Supreme Court relies

3    on when they do their gravamen analysis and consistently reject

4    attempts by a plaintiff to recast or label malpractice claims

5    as different claims.

6              And the reason for that is, is basically 6-1012 says

7    "If a claim is due to any provision of healthcare, then the

8    plaintiff must show that the -- that the defendants negligently

9    failed to meet the standard of healthcare practice."  And that

10   leads the Idaho Supreme Court to basically say all these

11   claims, if it arises out of the provision of healthcare, are

12   negligence claims.  And you can't recast them or relabel them

13   as other types of claims including a fraud claim.

14             THE COURT:  That's why I was asking, though, if he

15   doesn't have a medical malpractice claim, because he wasn't the

16   patient, can he then bring a fraud claim or a breach of

17   contract claim alleging that the doctor breached those even

18   though the breach would have been a medical situation?

19             MR. FRIESS:  Well, Your Honor, and that's what I was

20   getting to.  Idaho 6-1012 states -- and I will quote, to -- it

21   applies to any case, claim, or action for damages due to injury

22   or death of any person from the provision of healthcare.  It's

23   not just the person who has -- who received the healthcare.

24   Any claim.

25             To -- again, "To any claim -- any case" -- excuse

1   me -- "claim, or action for damages due to the injury or death

2   of any person."  And then at the end, it goes and just says,

3   you know, "on account of provision of or failure to provide

4   healthcare.  On account of" -- and this is the important

5   language also, Your Honor -- "any matter incidental or related

6   thereto."

7          THE COURT:  So, if I'm understanding what you're

8   telling me, you're telling me that it doesn't matter which of

9   the plaintiffs we're talking about.  They only have one claim,

10  and that claim is medical malpractice, if they have that.

11         MR. FRIESS:  If they have that.  Correct, Your Honor.

12         THE COURT:  Okay.

13         MR. FRIESS:  Because I don't think it can be argued

14  credibly that this doesn't relate -- that this isn't incidental

15  or related to the provision of healthcare.  So, I think that

16  precludes any -- any of these alternative claims outside of the

17  medical malpractice claim.

18         I want to discuss Mrs. Rowlette's claims briefly, and

19  Ms. Rauer covered this in depth, so I won't take too much time.

20  But plaintiffs have kind of basically alleged that Mr. Fowler

21  and Mrs. Rowlette can salvage their personal injury claims.

22  But I think the most important thing there is Mrs. Rowlette

23  didn't have any type of physician/patient relationship at the

24  time of the alleged wrongdoing.

25         And I think that's their argument in the sense that

1    their other claims, their other personal injury fraud claims

2    are saved, because they weren't the ones receiving the

3    healthcare.

4            So, beyond the argument that I put forth to the Court

5    about the language of Idaho 6-1012, Mrs. Rowlette wasn't even

6    conceived at the time of the alleged wrongdoing; therefore,

7    there was no physician/patient relationship.  And because there

8    was no physician/patient relationship, there can be no breach

9    on the part of Dr. Mortimer to her.

10           So, I think her medical malpractice claim, all of her

11   claims need to be dismissed simply for the fact that she was --

12   she wasn't even -- not only was she not alive, but she wasn't

13   even conceived at the time of the alleged wrongdoing.

14           Other than that, Your Honor, I think the law under --

15   for respondeat superior is pretty clear.  Many -- the law of

16   respondeat superior is basically the employer is responsible

17   for the wrongdoing of their employees or their agents.

18           To the extent that this Court dismisses any claims

19   against Dr. Mortimer, then those claims also need to be

20   dismissed against my client, OGA.

21           Other than that, Your Honor, I think Ms. Rauer

22   covered all of the points that I was going to discuss, so --

23           THE COURT:  Thank you.

24           MR. FRIESS:  Thanks.

25           THE COURT:  Mr. Meehan.  Before you get started, I

1  have a couple questions that don't really go to the
2  technicalities of the law, but I still want to know the
3  answers.  So, I thought I'd ask them up front before you get
4  into your presentation, if that's all right.
5          MR. MEEHAN:  Your Honor, that is fine.  I am happy to
6  answer them for the Court.
7          THE COURT:  The first one, hypothetically, if the
8  name that had popped up on ancestry.com had been somebody
9  else's name, other than the doctor's, wouldn't we still be in
10  the same boat?  All of a sudden she would know, "Hey, Dad may
11  not be Dad"?
12          MR. MEEHAN:  To the extent that the claim -- the
13  answer is yes, but it is a misunderstanding of our claim,
14  because the damage here isn't the non-paternity event.  It's
15  not that Dad wasn't Dad.
16          It's that the trusted healthcare provider used his
17  own semen to impregnate Ms. Ashby in front of her husband,
18  Mr. Fowler.  And his identity and his lack of anonymity in the
19  way it's understood in this context gives rise to the claim.
20          So, it's not the non-paternity event.  It is the fact
21  that Ms. Ashby's physician and, as we allege, Mr. Fowler's
22  physician and Ms. Rowlette's physician used his own semen to
23  cause this pregnancy.  And so the identity is an issue.
24          And as part of that, if -- if you could accept that
25  once, as a doctor, you impregnate your own patient without her

1    consent, that -- that that's an anonymous donor, then it would

2    seem to me that Dr. Mortimer had an obligation not to put his

3    genetic material on ancestry.com and open himself, in fact, to

4    this identification.

5         So, Your Honor, I think that the answer to your

6    question is yes, but the question doesn't fully comprehend our

7    allegation.

8         THE COURT:  I appreciate that.  The second question

9    maybe flows out of what you just told me, and that is the

10   bottom line here is what damages are your clients seeking in

11   this case?

12        MR. MEEHAN:  Okay.  Your Honor, the damages here are

13   largely damages for emotional distress.  And we do believe that

14   our allegations in the complaint are sufficient to withstand a

15   motion to dismiss in terms of that emotional distress.

16        To the extent -- and especially under the standards

17   here, which is you have to take what we've alleged in the

18   complaint as true, and you have to draw all reasonable

19   inferences from that.

20        And we -- when we talk about immeasurable suffering,

21   that includes tears, and gnashing of teeth, and shortness of

22   breath, and pain in the chest.  And to the extent that is not

23   adequately pleaded, in Your Honor's view, we believe that we

24   should be granted leave to amend and add those specific

25   allegations.

1          It's been treated as if there's magic language that
2    we need to produce, and we will be happy to add to the
3    allegations that we have in terms of those physical aspects.
4    There will be some lost wage allegations as part of this.
5    There will be some medical cost allegations as part of this.
6    But I will be truthful, Your Honor.  Most of it is emotional
7    distress.
8          And also, as we move this case forward, we fully
9    anticipate that there will be sufficient grounds to later bring
10   a motion to allow punitive damages in this case because of the
11   absolutely outrageous conduct of Dr. Mortimer in his employment
12   with OGA.
13         If Your Honor has additional questions, that's fine.
14   If not, I'd like to straighten out an area of our briefing that
15   I think is somewhat inartful and, as part of that, address the
16   gravamen analysis, Your Honor.
17         THE COURT:  Before you get to that, let me just ask
18   right off the bat.  How can Linda Mortimer remain in this case?
19         MR. MEEHAN:  Your Honor, we believe that the
20   community property of the Mortimers should be subject to this
21   case, because Mr. Mortimer's acts were --
22         THE COURT:  I agree with you.
23         MR. MEEHAN:  Okay.  Was for the benefit of the
24   marital community inasmuch as he's earning a living doing it.
25   And otherwise, Your Honor, I would rely on our briefing.  And

1    based on that, if Your Honor feels that she should be

2    dismissed, then we understand that, and -- and that will be the

3    result.

4            I do not have any allegation that Ms. Linda Mortimer

5    personally took any action other than being part of the

6    Mortimers' marital community.

7            THE COURT:  And to make it clear, I do believe she

8    should be dismissed, but I'm not suggesting that they can't get

9    to the community property because she's not in the case.

10           MR. MEEHAN:  And Your Honor, I understand that, and I

11   won't argue that.  And in the aid of narrowing argument and

12   being as direct as possible, I'd also like to be clear.

13           To the extent we have pleaded them, the plaintiffs

14   waive any claim based on battery and will not pursue that

15   claim.  The plaintiffs waive any claim based on breach of

16   contract and will not pursue that claim.  The plaintiffs waive

17   any claim based on the Consumer Protection Act and will not

18   pursue those claims.

19           With those waivers, that leaves us with claims of

20   medical negligence and lack of informed consent with regard to

21   all plaintiffs; also with intentional infliction of emotional

22   distress and negligent infliction of emotional distress with

23   regard to all plaintiffs at this time.  And I will discuss that

24   further in the gravamen analysis.  And also a fraud claim with

25   regard to Mr. Fowler in the event that he is found not to have

1   been a patient.

2           And so if I may move into that gravamen analysis,

3   Your Honor, we have some inartful language in our brief.  And

4   specifically, it's on page 17, and it says "Plaintiffs' claims

5   are not subject to the gravamen analysis."

6           And, Your Honor, to make that statement accurate,

7   there need to be some words added to it.  The plaintiffs'

8   claims are not subject to dismissal as a result of the gravamen

9   analysis.  And I would like to be clear that in Section D on

10  pages 17 and 18 of our brief, it is not our intention to waive

11  any claim on behalf of any of our clients, on behalf of any of

12  the plaintiffs.

13          So, getting to the gravamen analysis, Your Honor --

14          THE COURT:  I just -- I got lost right there.  You

15  are not waiving any claims, but you just told me a bunch of

16  claims are out.

17          MR. MEEHAN:  Okay.  Not -- okay.  We are not waiving

18  any claims as a result of the language on pages 17 and 18 of

19  our briefing.

20          THE COURT:  Oh.

21          MR. MEEHAN:  I stand here before the Court and tell

22  you the claims I just said were waived are waived, but I don't

23  want the Court to take from our less-than-artful language on

24  pages 17 and 18 that we are waiving any other claim.

25          THE COURT:  Okay.  Thank you.

1          MR. MEEHAN:  And so in the gravamen analysis, the

2   defense would like to tell the Court that in a medical

3   malpractice -- or, excuse me -- in an action related to the

4   provision of healthcare, that the plaintiffs cannot plead any

5   claim other than medical negligence.

6          And, Your Honor, that's not the case.  And I know

7   that you are familiar with these analysis.  And the case that I

8   would start with, which is cited by the defendants in their

9   briefing, is the *Hall* case, Your Honor.  And *Hall* is a very

10  interesting case in that the claims brought in the case were

11  not a medical negligence claim.  In fact, it was a battery

12  claim, an invasion of privacy claim, and a claim for

13  intentional infliction of emotional distress.

14         And the matter made it through the early phases of

15  litigation and was not dismissed.  There were other claims that

16  were dismissed, but these were not.  And, in fact, all three of

17  those claims were allowed, as I'm sure Your Honor is aware, to

18  proceed through the discovery phase.

19         And in *Hall*, what the Court said is not that you can

20  only bring a medical negligence action if the basis is

21  healthcare.  What it says is if you bring an action, whether it

22  be a battery, whether it be invasion of privacy, or whether it

23  be intentional infliction of emotional distress, and the basis

24  for that cause of action involves a provision of healthcare,

25  that you must meet the proof requirements of Idaho 6-1012 and

1  6-1013.

2          So, the issue in *Hall* was the fact -- not the fact

3  that they pleaded battery, invasion of privacy, or intentional

4  infliction of emotional distress.  The issue was their expert

5  declarations were insufficient to survive summary judgment.

6          So, Your Honor, I think the *Hall* case is very

7  instructive.  And I -- as I recall, the trial court in *Hall* --

8  and I believe it's a case that you decided, Your Honor --

9  relied on *Litz versus Robinson*, which is an Idaho Court of

10  Appeals case that is very instructive in this instance.

11          In the *Litz* case, Mr. Litz brought claims on behalf

12  of his wife and himself.  Initially they were represented.  In

13  the end, Mr. Litz ended up pro se.  And during the pendency of

14  the action, which, for his wife was a medical negligence

15  action, but for him, it was brought as a negligent infliction

16  of emotional distress action.

17          And in *Litz*, the Court didn't say that you can't

18  bring a negligent infliction of emotional distress action as a

19  non-patient.  What the Court said is, in fact, there could be a

20  duty.  There -- there could be damages.  Those things can all

21  exist, but Mr. Litz again failed to meet the proof requirements

22  of Idaho Code 6-1012.  His affidavits at the summary judgment

23  stage of the case were insufficient, Your Honor.

24          And so I see that as being very instructive.  In

25  regard to these gravamen cases that we are discussing, I would

1    point out that there's only one case cited in the briefing that

2    was decided on a motion to dismiss.

3            Your Honor, if we look at these other cases, if we

4    look at *Hall versus Rocky Mountain*, *Hoover versus Hunter*, *Hough*

5    *versus Fry*, and *Litz*, all of those cases were summary judgment

6    cases, Your Honor.  They made it past the discovery phase, and

7    the plaintiffs were allowed to go and to obtain the proof that

8    they believed was necessary to satisfy Idaho Code 6-1012 and

9    6-1013.

10           And unfortunately, in those cases, they didn't.  But,

11   they were allowed to pursue that.  And again, in the *Litz* case

12   and in the *Hall* case, it wasn't medical negligence as the

13   primary claim that was at issue.  In one it was negligent

14   infliction of emotional distress and in the other the battery,

15   invasion of privacy, and intentional infliction of emotional

16   distress.

17           So, Your Honor, the gravamen analysis, for one,

18   really isn't applicable here.  The place that it would be and

19   the case that I would look at, Your Honor, on this is called

20   *Keyser*.  And it's an Idaho District Court case.  It's not

21   binding on the Court, but I think it is very instructive.

22           And what this case said is that in a medical

23   negligence action, you cannot also have a Consumer Protection

24   Act claim.  But here's the interesting part to it, and it's the

25   reason we just waived the Consumer Protection Act claim.

1          A consumer -- we're talking -- there are two pieces

2     to the gravamen analysis.  One piece is the evidentiary

3     standards of Idaho Code 6-1012 and 6-1013, but the other piece

4     is the theory.

5          And it says, "Is the theory that you're pleading

6     subsumed within the medical negligence or the intentional

7     infliction of emotional distress or the negligent infliction

8     claim?"

9          And I would point the Court out to language in *Keyser*

10    where the Court asks, regarding the Consumer Protection Act

11    claim, "Would not the mandatory language in Idaho Code Section

12    6-1012 still require the plaintiff to prove negligence before

13    any recovery of damages be allowed?  If so, does recognition of

14    such a claim add any further protection to the plaintiff over

15    the negligence action?

16          "Certainly, Idaho Code Section 6-1012 mandates that

17    any claim must include, as a prima facie element, the

18    negligence of the healthcare provider."

19          Well, Your Honor, we don't take that as binding in

20    terms of that you can only seek damages for negligence.  We

21    believe that the acts here were, in fact, intentional, they

22    violated the standard of case and constitute medical negligence

23    or medical malpractice.

24          But as you pointed out with the fraud claim, in the

25    event that Mrs. Rowlette or Mr. Fowler are found not to be

1    patients, they still may have been damaged by Dr. Mortimer.

2              Now, we would acknowledge that we must prove their

3    case in accordance with Idaho Code 6-1012 and 6-1013.  So, to

4    the extent they were damaged, we will have to provide

5    professional expert opinion with regard to what occurred.

6              So, Your Honor, I don't think that the gravamen

7    analysis prevents these claims or allows for dismissal of these

8    claims at this stage.  These claims should be allowed to go

9    through discovery so that we can make the determination.

10             Another item I would point out here that's very

11   important.  In all of the other gravamen cases, there is no

12   dispute as to whether the plaintiff was a patient of the

13   physician in question.

14             Now, we have the *Litz* case, where we have a

15   non-patient whose claim was considered by the Court.  Here, I

16   do think, because we are past the answer, that the Court should

17   consider at least this fact of the answers.

18             The defendants deny that Mr. Fowler and Ms. Rowlette

19   were patients of the doctor.  And so that is different and

20   distinguishes this case from any of the other gravamen cases

21   that have been cited.  And I think that is important, because

22   as you said, if they are not patients, their claims may be

23   different.  If they are patients, then we may be limited, but

24   not at this stage of the litigation.  That's a question for

25   summary judgment, or that's a question for pretrial motions or

1   a halftime motion, but it's not a question on a motion to

2   dismiss.

3           With that, Your Honor, I would like to move on to the

4   statute of limitations issue.  And first of all, the statute of

5   limitations issue, I think there's a very good analogy that I'd

6   like to draw the Court's attention to.  And it's in the case of

7   *Streib v. Veigel*, which is 109 Idaho 174 at 179.  And it's

8   cited in *Curtis v. Furth* which is in our briefing.

9           And the Court, in *Curtis*, says *Streib v. Veigel*

10  addressed this troubling concept in the context of a

11  professional malpractice action.  And I'm quoting.  "If A sets

12  a spring gun and two years elapse before B, a police officer,

13  opens the door, has B's cause of action been barred by the

14  statute of limitations or is the tort continuing in nature

15  until B is damaged?  Clearly, the latter result should obtain.

16  In the instant case also, we hold that the tortious negligence

17  is continuing in nature until the plaintiffs suffer damage."

18          The Court goes on to say, "Unlike either *Farber* or

19  *Woodland*, *Streib* refers to a situation where an act or acts

20  occur but no damages arise for a period of time.  This case was

21  the genesis of the some damage exception to the plain reading

22  of Idaho Code 5-219(4) providing that no cause of action will

23  be deemed to have accrued until some damage has occurred."

24          Dr. Mortimer set a trap 37 years ago, Your Honor.  It

25  didn't spring until 2017.  The fact that that trap didn't

1    spring, the fact that the plaintiffs weren't damaged until 2017

2    should not prevent their recovery based on the statute of

3    limitations, Your Honor.

4         More so, Dr. Mortimer, to the extent that he wants to

5    claim he was an anonymous donor, which seems to be quite the

6    assertion under the circumstances, it gets to the fact that if

7    he was to remain anonymous, he shouldn't have put his genetic

8    material out and open for the public to be discovered by this

9    family on ancestry.com.

10        Now, it would be different, maybe, if he were -- if

11   there were truly an anonymous donor and this were just a

12   non-paternity event.  Your Honor, we wouldn't be here.  This

13   was a doctor who was trusted by a young couple who were seeking

14   to conceive a child, and he suggested to them that they undergo

15   a medical procedure that involved 85 percent Mr. Fowler's semen

16   and 15 percent donor semen.  And he took it upon himself to

17   instead impregnate Ms. Ashby while standing there in front of

18   her husband in the room.

19        I would also, Your Honor, suggest that Mr. Fowler's a

20   foreseeable victim in this.  He's a foreseeable plaintiff.

21   And, in fact, Ms. Rowlette, even though unconceived at the time

22   of that action, was also a foreseeable victim, a foreseeable

23   plaintiff.

24        This doctor should have known that by doing what he

25   did, he violated this family's trust beyond any conceivable

1    notion, and it has caused them immeasurable harm.

2            Your Honor, I understand that there are some cases

3    where there's not a road to recovery.  This is not one of them.

4    So, I would also, Your Honor, like to ask if there is any

5    question as to the gravamen analysis or any thought of

6    dismissing on that basis, the claims that we are maintaining,

7    at this time, negligent infliction, intentional infliction,

8    medical negligence, and lack of informed consent, that we be

9    allowed additional briefing in regard to that issue.

10           Regarding the negligent infliction and emotional

11   infliction, I think I've already addressed that.  That in

12   drawing all reasonable inferences in favor of the plaintiff

13   here, we have pleaded those causes of action sufficiently, and

14   they should be allowed to stand.  To the extent that they are

15   not pleaded sufficiently, we should be allowed leave to amend.

16           I have already addressed the statute of limitations

17   in regard to the some damage.  We also have the tolling issue.

18   And, Your Honor, I believe it's quite clear that these personal

19   injury claims have been tolled by the -- by the fraudulent

20   concealment.

21           Your Honor, it's like a snake eating itself from the

22   tail up to suggest that Mr. -- that Dr. Mortimer shouldn't have

23   informed Ms. Ashby that he intended to use his own semen to

24   impregnate her and then had an obligation not to tell her and

25   not to provide her with the informed consent.

1          Lastly, it would be wholly inequitable.  And we

2     believe that the standard is met, but it would be wholly

3     inequitable to let Dr. Mortimer and OGA escape liability in

4     this matter as a result of the fact that they kept it quiet

5     long enough.

6          The last thing, Your Honor, that I'd like to address,

7     before I might have the chance to address, just a couple items

8     that were brought up by the defendants in their argument is the

9     lack of informed consent.  And there certainly is a sufficient

10    pleading for Ms. Ashby to maintain a lack of informed consent

11    claim.

12         And frankly, I would contend all of the defendants,

13    but I would rely on the *LePelley* case, which was the law around

14    this time in 1980.  It was the law of the state.  And there is

15    a suggestion that you only have to inform the patient of risks,

16    and being inseminated by your own doctor's semen is not a risk.

17         Well, I think we have alleged it's breach of the

18    standard of care, and you should probably warn your patient if

19    you are going to breach the standard of care.  But I would rely

20    further on the language from *LePelley*, where they said that

21    informed consent includes such additional information as a

22    skilled practitioner of good standing would provide under

23    similar circumstances.  And that a failure, Your Honor, to do

24    that is a grave affront to self-determination and bodily

25    autonomy.

1          Your Honor, we have made sufficient allegations.  And

2     I would ask the Court how much time I -- I have remaining.

3          THE COURT:  I rely on you to keep track of it.  I

4     don't know.  You are okay.

5          MR. MEEHAN:  Well then, Your Honor, I would just like

6     to address a couple other items very, very briefly.

7          THE COURT:  I will tell you Judge Winmill has a

8     hearing in here at 3:30.

9          MR. MEEHAN:  Your Honor, I will be much quicker than

10    that.

11         THE COURT:  As the senior judge, he gets this room.

12         MR. MEEHAN:  Okay.  Your Honor, I guess the last

13    thing I'd like to address is that anonymous doesn't just mean

14    unnamed.  Even listening to the definition that Ms. Rauer put

15    forward, unnamed, unknown, not revealed, Your Honor.  We are

16    not dealing with a situation of unnamed, unknown, and not

17    revealed, Your Honor.

18         And there's this allegation that Ms. Ashby and

19    Mr. Fowler have done something wrong by not wanting to tell

20    their child the circumstances of their conception.

21         Well, Your Honor, I would suggest to you that most

22    parents do not want to discuss with their children the

23    circumstances of their conception.  Ms. Ashby and Mr. Fowler

24    were no different Your Honor.

25         What's been done here is an egregious, egregious

1  wrong.  It goes beyond any comprehension of rightness.  And,

2  Your Honor, beyond that, there is a legal remedy for it, and we

3  should be entitled to pursue it.  And except with regard to the

4  claims that are waived, we would ask that you deny the motions

5  to dismiss.

6         And I thank you for your time, Your Honor, and will

7  answer any additional questions you might have.

8         THE COURT:  I don't have any.

9         MR. MEEHAN:  Thank you.

10        THE COURT:  Thank you.  Go ahead.

11        MR. RAUER:  Thank you, Your Honor.

12        Mr. Powers has informed me that I have a few minutes

13  left, although he didn't say that.  He wrote that on a sticky

14  note for me.

15        I'm kind of going to go in reverse order, if you

16  don't mind.  I want to address the informed consent issue.  In

17  the *LePelley* case, *LePelley* relied upon the holding from *Cobbs*

18  *versus Grant*, a California case.  And the *Cobbs versus Grant*

19  decision stood for the proposition that informed consent had to

20  do with warning the patient about known risks of death or

21  serious bodily injury.

22        We don't have those here, Your Honor.  That's the

23  problem.  We don't have those here.  And it goes back to our

24  arguments earlier; what are the damages?  And you hit the nail

25  on the head.  Wouldn't we be talking about these same types of

1  things had this been some other person besides Dr. Mortimer.

2  That's the point.  It's the paternity issue that caused the

3  devastation and the immeasurable suffering.  That would have

4  happened anyway.

5          With regard to the arguments about the gravamen

6  analysis and the *Hall versus Rocky Mountain Emergency*

7  *Physicians*, you may not be familiar with that, because Judge

8  Horton actually wrote that decision.

9          THE COURT:  Who was the trial judge?

10          MR. RAUER:  He was the trial judge.  Yes, yes.

11          THE COURT:  Judge -- oh, okay.  Because I just looked

12  it up, and I thought it had my name on it.

13          MR. RAUER:  I thought that Judge Horton was the trial

14  judge on that one, Your Honor.  But regardless, regardless.

15          THE COURT:  Yeah.  Was it affirmed or reverse?

16          MR. RAUER:  I believe that it was affirmed.

17          THE COURT:  Well then, it had to be my case.

18      (Laughter.)

19          THE COURT:  No, it doesn't matter.  I don't mean to

20  take up your time.

21          MR. RAUER:  No, no problem, Your Honor.  I just want

22  to point out that those cases that plaintiff has cited, he's

23  correct.  They were decided on motions for summary judgment,

24  but it's not the appellate court's role to look back and say if

25  they were to be decided on a motion to dismiss.

1          The attorneys just decided that they weren't going to

2   pursue those claims.  The law and the rationale and the

3   reasoning that applies to those decisions is the same in this

4   circumstance.  It goes back to what's required under 6-1012.

5   And they wouldn't let those claims go forward because they were

6   bound up in a medical malpractice action.

7          So, it doesn't matter if it was a motion to dismiss

8   or a summary judgment.  If they are bound up in a medical

9   malpractice action, a separate cause of action for those types

10  of claims cannot move forward.

11         THE COURT:  Well, and, frankly, a court doesn't

12  decide if there's going to be a motion to dismiss.  That's up

13  to the attorneys.

14         MR. RAUER:  Correct.  Correct.  And the attorneys in

15  those cases opted not to do that.  We don't know why.  We can't

16  guess why.  And you are right.  The Court doesn't decide and

17  criticize, you know, "Why didn't you bring a motion to dismiss?

18  Why are you wasting my time on summary judgment?"  That's

19  not -- that's not the role of the judiciary certainly.

20         But I just wanted to make that distinction, Your

21  Honor, that it's one without a difference.  The procedural

22  position of those cases is different, but the rationale and the

23  outcome are the same, and they are applicable in this

24  particular instance.

25         You know, this isn't a case, Your Honor, where

1    Mrs. Fowler went to Dr. Mortimer for a pap smear, and he

2    impregnated her during that type of a procedure.  She wanted a

3    child.  They wanted a child.  They got a child.  It's a

4    positive outcome.  Where is the damage?

5            They -- we still have not heard, even in oral

6    argument today, what is the damage.  Are they wishing that they

7    didn't have this child?  Are they wishing that they could send

8    her back?  Are they claiming that it was this horrific

9    childhood, and had they known, they would have made a different

10   choice and aborted the pregnancy had they known?  There are

11   none of those claims, Your Honor.

12           Where is the damage?  This was a positive benefit for

13   this family.  And we still maintain that the statute of

14   limitations applies and the gravamen analysis applies to

15   preclude several of those claims.

16           I would also ask for clarification from Mr. Meehan on

17   the page 17 of their briefing.  They appeared to have conceded

18   that Ms. Rowlette and Mr. Fowler are not going to be pursuing

19   claims of medical malpractice.  And I am not clear what their

20   position is based on the arguments in their opposition.

21           So, to the extent there might be some remaining

22   confusion, I would like that squared away before I -- we part

23   company today, Your Honor.

24           With that, I will stand for further questions.  If

25   not, I will sit down.

1          THE COURT:  I don't have any.  Thank you.

2          Mr. Meehan, can you answer that question?

3          And I will tell you -- I am familiar with your brief,

4    but I can't tell you what's on page 17.

5          MR. MEEHAN:  Your Honor, as I said, there was some

6    language on page 17 that's less than artful.  And I --

7          THE COURT:  I guess the question is, are you

8    conceding that father and daughter don't have a medical

9    malpractice claim?

10          MR. MEEHAN:  No, Your Honor, we are not.

11          THE COURT:  Okay.  Thank you.  That's it.

12          MR. MEEHAN:  Thank you, Your Honor.

13          THE COURT:  Mr. Friess, you don't even have enough

14   time to get to the podium, so you are welcome to stand right

15   there and say whatever you want to say.

16          MR. FRIESS:  Well, your Honor, just --

17          THE COURT:  I'm just teasing you.

18          MR. FRIESS:  I will go to the podium if that's all

19   right with Your Honor.

20          THE COURT:  That's all right.

21          MR. FRIESS:  Otherwise, I'm just a tagger along here.

22   But I wanted to address this notion that Mr. Meehan brought up

23   and argued about the some damage.

24          As we've cited in our brief, the Supreme Court -- the

25   Idaho Supreme Court in *Conner versus Hodges* -- that's 157 Idaho

1    19 -- they stated "When determining whether some damage has

2    occurred, the trial court is to determine the point at which

3    the fact of injury becomes objectively ascertainable."

4           And Ms. Rauer kind of addressed that.  But the Court

5    goes to say "by objectively ascertainable, we mean that

6    objective medical proof would support the existence of an

7    actual injury."

8           And, you know, Mr. Meehan put forth this artful

9    picture of this trap.  But in essence, that you're -- it's

10   not -- it doesn't accrue until it's been discovered.  But the

11   Supreme Court rejected that in *Steward versus Jorgensen*.  And

12   that's 150 Idaho 701 for the Court's notes.

13          It says -- and they said "To allow for accrual to

14   begin only once the parties have been put on notice of the

15   damage or, in other words, once the damage is actually

16   ascertained would effectively create a discovery rule which the

17   legislature has rejected."

18          And I think the *Steward* case is instructive to the

19   Court on this point.  In *Steward*, there was a back surgery.

20   They operated on the wrong level.  There was a fusion, I

21   believe.  They operated at the wrong level.  Relieved the guy's

22   pain and symptoms.  And it wasn't until two days -- two years

23   later, when they went back and did an MRI, that they discovered

24   it.

25          And the Court in *Steward* basically said "Had

1    objective medical proof in the form of an MRI been ordered, it

2    would have shown that the surgery was performed at the wrong

3    level and that Steward had suffered damages as a result of its

4    performance at the wrong level."

5            So basically, they are saying "Had you done an MRI

6    back then, you would have discovered it, but you didn't."

7            THE COURT:  Did they suggest that there was any

8    reason to do an MRI back then?

9            MR. FRIESS:  No.  There was no suggestion to do an

10   MRI, because the guy's symptoms had been relieved by the -- I

11   guess miraculously by the fusion at the wrong level.

12           And that's the point here, Your Honor.  There is

13   nothing in the case law or the law to suggest that you have to

14   have some reasonable suspicious or reasonable belief that this

15   would happen.  Otherwise, they would have let the plaintiff's

16   claim in *Steward* to go forward, because he had no reasonable

17   belief -- no reasonable objective reason to assume that he --

18   that the surgery had been performed at the wrong level.

19           That's the same case here, Your Honor.  Objective,

20   ascertainable medical proof was available through a DNA test.

21   Now, the plaintiffs are going to say, again, "We have no

22   reason -- we had no reason to suspect it."  There are some

23   claims where you have to have a reasonable suspicious or a

24   reasonable belief that these things would have occurred, but

25   objectively ascertainable, the some damage rule or principle

1  does not take into consideration whether a plaintiff has reason

2  to suspect or believe and -- that something has occurred.  And

3  that's very clear from the *Steward* decision, I think.

4          So, with that, Your Honor, I won't take up any more

5  of your time.  Thank you for letting me come to the podium

6  again.

7          THE COURT:  Thank you.

8          MR. MEEHAN:  Your Honor, may I have 90 seconds of

9  surrebuttal on that specific issue?

10         THE COURT:  You may.  But I will be timing you this

11  time.  Oh, we don't have a secondhand.  Never mind.

12         MR. MEEHAN:  Your Honor, first of all, there was no

13  reason for a DNA test.  Second of all, as we said --

14         THE COURT:  Sounds like they are saying their case

15  says you don't need a reason.

16         MR. MEEHAN:  Okay.  But here is the other piece to

17  it.  A mere non-paternity event in this case, and we're not

18  standing in this courtroom.  If it happened to be that this

19  were actually an anonymous donor, we are not in front of you,

20  Your Honor.

21         This was a trusted healthcare provider who

22  impregnated his patient and didn't tell her about it.

23         THE COURT:  So, you're telling me that the claim

24  really didn't arise until Kelli saw the birth certificate and

25  the doctor's name on it that matched.

1          MR. MEEHAN:  Well, for Kelli, that's when the claim

2     arose.  For her mother, it arose in July of 2017 when she

3     realized that the match on Ancestry was her fertility doctor.

4     So --

5          THE COURT:  Which happened first there?

6          MR. MEEHAN:  Well, actually, it was Ms. Ashby having

7     the realization that the match on Ancestry -- her daughter had

8     given her the account information, and she looked.  And she was

9     shocked that her fertility doctor is suggested to be her -- the

10     father of her daughter, when it should be -- if it were an

11     anonymous donor, we wouldn't be here.

12          This was a trusted physician who impregnated his

13     patient.  And, yes, they have a daughter.  But the damage is

14     that this man abused his trust and violated the standard of

15     care and did so knowing that it could or certainly he should

16     have known that it could have great harm to this family that he

17     did such an inconceivable act.

18          So, Your Honor, thank you very much for the time on

19     surrebuttal, but we don't believe that this suggestion gets us

20     anywhere.

21          The other issue would be without the knowledge of

22     Dr. Mortimer being the father, there wouldn't have been

23     anybody -- you know, there couldn't have been any link or a

24     paternity test, because again, I come back to the non-paternity

25     event wouldn't have been the issue.  It's the identity of

1    Ms. Rowlette's biological father here.  And that wasn't

2    discovered until 2017, Your Honor.  Thank you.

3              THE COURT:  All right.  Counsel, I appreciate

4    everybody's briefs.  I appreciate the arguments that have been

5    made here today.  I will take this under advisement and issue a

6    written decision.

7              One of the great things about being on the federal

8    bench instead of the state bench is on the state bench, I only

9    had 30 days to get it out or I didn't get paid.  The federal

10   bench doesn't have that rule.

11             However, I am trying my best to get all my decisions

12   out within 30 days anyway, and I will do my best in this one as

13   well.

14             So, unless there's anything further, hearing nothing,

15   we are in recess.

16             MR. MEEHAN:  Thank you, Your Honor.

17             MR. RAUER:  Thank you, Your Honor.

18        (Recess 3:05 p.m.)

19

20

21

22

23

24

25

--oOo--

COURT REPORTER'S CERTIFICATE


    I, KATHERINE EISMANN, Official Court Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Date:  September 14, 2018.

                         /s/ **Katherine Eismann**

                        Katherine Eismann, CRR, RDR