UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KELLI ROWLETTE, an individual, SALLY ASHBY, an individual, and HOWARD FOWLER, an individual,<br><br>       Plaintiffs,<br><br>       v.<br><br>GERALD E. MORTIMER, M.D., LINDA G. McKINNON MORTIMER, and the marital community comprised thereof, and OBSTETRICS AND GYNECOLOGY ASSOCIATES OF IDAHO FALLS, P.A., an Idaho professional corporation,<br><br>       Defendants. | Case No. 4:18-cv-00143-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. INTRODUCTION

Pending before the Court is Defendants Gerald Mortimer and Linda G. McKinnon Mortimer's (the "Mortimers") Motion to Dismiss. Dkt. 16. Defendant Obstetrics and Gynecology Associates of Idaho Falls, P.A.'s ("OGA") also filed a Motion to Dismiss based upon the same general arguments. Dkt. 17. After holding oral argument, the Court took the motions under advisement. Upon review, the Court now issues the following decision GRANTING in PART and DENYING in PART the Motions.

The right to procreate has been recognized by the United States Supreme Court in *Skinner v. Oklahoma,* 316 U.S. 535 (1942), albeit in the context of sterilization. In *Skinner,* the Supreme Court stated:

This case touches a sensitive and important area of human rights. Oklahoma deprives certain individuals of a right which is basic to the perpetuation of a race – the right to have offspring.

. . . .

Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, farreaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty.

*Id.* at 541.

The *Skinner* court recognized that the power to sterilize, when wielded by evil hands, deprives others of a fundamental right. Today, the Court is not asked to address improper sterilization; however, the alleged misconduct is similarly abhorrent and concerning. When a woman pursues artificial insemination, she and her loved ones entrust their physician with access to, and power over, areas of life that are unusually intimate and sacred. When that trust is unknowingly placed in a physician with evil hands and selfish motives, the fundamental right of procreation is debased and degraded. Today, the Court addresses such an allegation.

Plaintiffs Ashby and Fowler were married and struggled to procreate. They decided to undergo artificial insemination with sperm from an undisclosed donor. Defendant Dr. Mortimer allegedly used his own sperm to artificially inseminate Ashby. He did not disclose that it was his sperm. There can be little argument that Mortimer's alleged conduct in using his own sperm to artificially inseminate Ashby without her knowledge is morally repugnant, ethically questionable, and demeaning to Ashby. The

Court does not take lightly allegations that a physician so grossly abused his position of trust, particularly when those actions are related to the important right of procreation. However, the issue here is whether Plaintiffs can legally recover under tort law for Mortimer's conduct.

## II. BACKGROUND

A. Factual[1]

In 1979, Plaintiffs Ashby and Fowler were a married couple residing in Idaho Falls, Idaho. The couple struggled to conceive children and consequently became patients of OGA under the care of Dr. Gerald E. Mortimer ("Dr. Mortimer"), an OB/GYN. Upon examination, Dr. Mortimer diagnosed Ashby with a tipped uterus and Fowler with low sperm count and low sperm motility. Dr. Mortimer recommended that the couple undergo a form of artificial insemination in which donor sperm from an anonymous donor would be mixed with Fowler's sperm in a lab prior to insemination to increase the chances of conception. In short, 85% of the mixture would be Fowler's sperm, while 15% was to come from the anonymous donor. The couple agreed to the procedure; however, they

_____

[1] The following facts are construed in the light most favorable to Plaintiffs. *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir.1996) (The Court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party").

requested that the donor be a college student with brown hair, blue eyes, and over six feet tall. It is unclear whether this request was verbal or in writing.

Ultimately, Dr. Mortimer performed the artificial insemination procedure on various occasions in June, July, and August of 1980. In August 1980, Ashby discovered that she was pregnant. On May 20, 1981, Ashby gave birth to Plaintiff Kelli Rowlette. Dr. Mortimer delivered Rowlette.

Subsequently, the family (Ashby, Fowler, Rowlette, and a son conceived after Rowlette without medical assistance) moved to Washington State.

In July 2017, Rowlette received notification from Ancestry.com that a DNA sample she had submitted matched a sample submitted by one Gerald Mortimer. Ancestry.com predicted that there was a parent-child relationship between the two individuals based upon the samples reviewed. Rowlette did not know Dr. Mortimer, and was, in fact, completely unaware that her parents had undergone artificial insemination to help them conceive some 38 years prior. Rowlette gave Ashby access to the Ancestry.com results. Ashby knew Mortimer had been her doctor, but she did not disclose this to Rowlette. Ashby did disclose the Ancestry.com results to her now ex-husband, Fowler, but he also did not disclose who Mortimer was to Ashby.

In October of the same year, Rowlette was going through personal documents at her father's home and noticed that the name of the delivering physician on her birth certificate was Dr. Gerald Mortimer.

Based upon Mortimer's role in Rowlette's conception, and the Ancestray.com DNA results, Plaintiffs' allege that instead of using sperm from an anonymous donor

back in 1980 to supplement Fowler's sperm for the artificial insemination procedure, Dr. Mortimer instead used his own sperm. Plaintiffs allege a variety of causes of action based upon this alleged improper behavior.

B.  Procedural

Plaintiffs filed their Complaint in this matter on March 30, 2018, alleging eight causes of action: medical malpractice, lack of informed consent, fraud, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, breach of contract, and violation of Idaho's consumer protection act. Dkt. 1. OGA filed an Answer on May 4, 2018. Dkt. 10. The Mortimers filed their joint Answer on May 29, 2018. Dkt. 13. On June 13, 2018, the Mortimers filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 16 Approximately one week later, on June 19, 2018, OGA filed a Motion to Dismiss also pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 17.

On June 26, 2018, Plaintiffs filed a Motion to Strike the pending Motions to Dismiss alleging that the Motions were improper and untimely. Dkt. 19. A short briefing schedule followed. The Court then took Plaintiffs' Motion under advisement and determined that while Defendants filed their respective Motions to Dismiss *after* filing responsive pleadings, such a tactical decision did not require the Court to strike the motions altogether, but simply convert them from Motions to Dismiss under Rule 12(b)(6) into Motions for Judgment on the Pleadings under Rule 12(h)(2)(B) and Rule 12(c).

# III. LEGAL STANDARD

Defendants seek dismissal for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). When a defendant brings such a motion after answering the complaint, the motion is treated as one for judgment on the pleadings under Federal Rule of Civil Procedure Rule 12(c), rather than Rule 12(b)(6). *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1301 n. 2 (9th Cir. 1992). Motions to dismiss under Rules 12(c) and 12(b)(6) differ only in the time of filing; because they are functionally identical, the same standard applies to motions brought under either rule. *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (citing *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). The Court evaluates a motion for judgment on the pleadings under the same standard applicable to motions to dismiss brought under Rule 12(b)(6). *See Enron Oil Trading & Trans. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 529 (9th Cir. 1997). The standard for a motion for judgment on the pleadings is articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

A motion to dismiss for failure to state a claim challenges the legal sufficiency of the claims stated in the complaint. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). "A complaint generally must satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) to avoid dismissal under a Rule 12(b)(6) motion." *Id.* (citing *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003)). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . .

claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

To sufficiently state a claim for relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations;" however, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In other words, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In light of *Twombly* and *Iqbal*, the Ninth Circuit summarized the governing standard as follows: "In sum, for a complaint to survive a motion to dismiss, the nonconclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Iqbal*, 556 U.S. at 663. A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate

unless it is beyond doubt that the complaint could not be saved by an amendment. *See*

*Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

## IV. ANALYSIS

Defendants[2] assert that all of Plaintiffs claims are barred by either (1) Idaho Code

section 6-1012 ("Section 6-1012"); (2) statutes of limitations; (3) Rule 12(b)(6)—failure

to state a claim; or (4) a combination of all of the above.

For organizational purposes, the Court will begin by discussing Section 6-1012

and the implications it has in this case. Second, the Court will address each claim and the

various arguments Defendants raise in favor of dismissal. Then the Court will review

Plaintiffs' arguments in support of why each claim should survive.

As a threshold matter, however, the Court must address certain arguments raised

concerning the parties in interest. The Court addresses these issues at the outset because

there is no need to discuss the claims as to individual plaintiffs if the Court determines

that a plaintiff is not a real party in interest and must be dismissed.

### A. Parties in Interest

#### 1. Ms. Mortimer

Defendants contend that the Court should dismiss Ms. Mortimer as a defendant

because Plaintiffs have not plead any claims against her, nor alleged any facts that

---

[2] The arguments in favor of dismissal are essentially the same for all defendants. Accordingly, the Court will refer to OGA and the Mortimers as collectively "Defendants" unless otherwise noted for a specific reason.

suggest any misconduct by Ms. Mortimer in relation to the underlying conduct of Dr. Mortimer. The Court must agree. Even a cursory review of the Complaint shows that Ms. Mortimer's name only appears twice: once in the caption, and once in the "Parties" section where Plaintiffs have listed her as the wife of Dr. Mortimer.

Plaintiffs assert that Ms. Mortimer is a proper defendant because marital property can be reached to satisfy any debt incurred as the result of a favorable judgment. In other words, Plaintiffs have listed Ms. Mortimer to ensure that in the event they prevail, there will be sufficient assets to cover any award, i.e., not just Dr. Mortimer's assets, but the marital community property as well. In support of their position, Defendants cite *Hegg v. IRS*, 28 P.3d 1004 (Idaho 2001), wherein the Idaho Supreme Court held that "community assets may be reached to satisfy a debt incurred by one spouse's fraud committed during marriage even if the other spouse is completely innocent of the fraud and has no personal liability where the fraud benefits the community or occurs during the spouse's management of the community." *Id.* at 1006.[3] While Plaintiffs correctly state the law, they need not list Ms. Mortimer—or the "marital community [property] comprised thereof"—as an actual defendant in this case. If a judgment or debt is owed, pursuant to law, community assets may be reached to satisfy the debt because Idaho is a community property state. Plaintiffs have not alleged any facts against Ms. Mortimer and they do not

---

[3] In *Hansen v. Blevins,* 367 P.2d 758 (Idaho 1962), relied on by the Idaho Supreme Court in *Hegg*, Mrs. Blevins was not a party to the lawsuit and did not participate in the tort, but community property was subject to the damage award. The same would be true here even though Ms. Mortimer is not a party.

need to list her specifically as a defendant for possible judgment/debt purposes.

Accordingly, the Court DISMISSES Linda Mortimer as an improper party.

### 2. Kelli Rowlette

Defendants contend that neither Rowlette nor Fowler have standing to bring this action because neither of them were "patients" of Dr. Mortimer, nor were either of them the recipients of the conduct that forms the basis of the claims at issue in this case.

As to Rowlette, it is clear she was never a patient of Dr. Mortimer's with respect to the alleged misconduct that took place before she was born. Said differently, Dr. Mortimer did not breach any duty of care to Rowlette because he owed her none. Plaintiffs assert that because Dr. Mortimer delivered Rowlette she was his patient. While the Court would agree that Dr. Mortimer—as the delivering doctor—likely owed a duty to Rowlette during and immediately following the delivery, those actions are not the event at issue in this case. Instead, the claims here arise from the insemination process, which (of necessity) occurred prior to Rowlette's birth.

Even assuming, arguendo, that Rowlette was Dr. Mortimer's patient (at the time of insemination) it is unclear what duty Dr. Mortimer breached or what damages Rowlette has incurred since then. Although Rowlette does not explicitly raise the argument, the only way to classify her potential damages in this case would be in the form of a wrongful life claim. The State of Idaho—like most jurisdictions—*does not* recognize claims for wrongful life. Idaho Code § 5-334; *Blake v. Cruz*, 698 F.2d 315 (Idaho 1984).

As will be discussed in greater detail below, if a medical malpractice claim is present, the Idaho Supreme Court has determined that most other claims are precluded.

*See Hoover v. Hunter*, 249 P.3d 851, 856 (2011) (*quoting Hough v. Fry,* 131 Idaho 230, 233 (1998)). This outcome stems from the unique evidentiary standards outlined in Section 6-1012 for medical malpractice claims.

Importantly, the Idaho Supreme Court has specifically held that intentional torts that arise out of the failure to provide adequate health care—such as claims for emotional distress—are to be construed as claims for medical malpractice. *Hall v. Rocky Mountain Emergency Physicians*, 312 P.3d 313 (Idaho 2013). Thus, under Section 6-1012, the emotional distress claims are subsumed into the medical malpractice claims—however, as the Court just noted, Rowlette does not have standing to bring any medical malpractice claim as she was not a patient of Dr. Mortimer's when the alleged malpractice occurred. This is presumably why Plaintiffs specifically noted at oral argument that if the Court did not find that Rowlette was a patient—and therefore did not have a valid medical malpractice claim—she could nonetheless proceed independently on her claims of emotional distress. The Court will not allow such a course of action for three reasons.

First, the statute of limitations has long since run on Rowlette's emotional distress claims. *See* Idaho Code § 5-219(4). As will be discussed in greater detail below, the claims in this case are not continuing torts subject to tolling. Thus, the statute of limitations acts as an independent bar on Rowlette's remaining claims.

Second, the broad language of Section 6-1012 itself disqualifies Rowlette's claims as its preclusion requirements relate to "any case, claim or action for damages due to injury . . . brought against any physician . . . on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto." Idaho Code

§ 6-1012. Here, there is no doubt that Rowlette's emotional distress was caused by a matter "incidental or related" to health care. Accordingly, even though Rowlette cannot pursue a medical malpractice action on her own, she likewise cannot pursue other intentional torts because this case is still nonetheless a medical malpractice action.

Third, and finally, it is not entirely clear that Rowlette's emotional distress in this case can be attributed to Dr. Mortimer. Ashby and Fowler never told Rowlette that they had undergone artificial insemination to achieve her conception. Their silence continued even after they knew that Mortimer may have used his own sperm. Thus, the underlying cause for the shock Rowlette suffered did not stem from the fact that Dr. Mortimer could be her biological father, but rather that the person she thought was her biological father—Fowler—was not.[4] In other words, even if Dr. Mortimer had not used his own sperm, Rowlette may have eventually made the same upsetting discovery—that the man she thought was her biological father was not. It was her parents' decision to not disclose that kept this information from Rowlette, not anything Mortimer did.

In conclusion, Rowlette was not a patient of Dr. Mortimer's at the time of the alleged malpractice, and therefore has no valid claim of medical malpractice. As for the

---

[4] The Court does not mean to minimize the understandable shock that Rowlette experienced as it relates to these events in their entirety; and admittedly, if the allegations in this case prove true, that shock may be compounded by the fact that Rowlette's mother's OB/GYN inseminated her with his own sperm. That being said, Rowlette did not know Dr. Mortimer any more than she would have known any third party who appeared in the Ancestry.com notice. Thus, it is difficult to say that the majority of her stress and shock came from Dr. Mortimer (the identity of the person itself) rather than the non-paternity of Fowler (who she always assumed was her biological father).

independent tort claims, it is difficult to ascertain any duty Dr. Mortimer owed Rowlette (and subsequently breached) or what damages she can recover under the circumstances. Because the damages cannot come via a wrongful life claim, Rowlette must meet all of the requirements of the independent tort claims. This, however, is essentially impossible as each claim is independently barred by the applicable statute of limitations as well as the requirements of Section 6-1012. Because the main issue in this case is medical malpractice—even though Rowlette cannot proceed with a medical malpractice claim herself—all other claims must be dismissed.

Accordingly, the Court DISMISSES Rowlette as a plaintiff in this suit.

### 3. Howard Fowler

As noted, Defendants assert that, like Rowlette, Fowler does not have standing in this action as he was never Dr. Mortimer's patient. Unlike Rowlette, however—whom Dr. Mortimer simply delivered—Fowler did have contemporaneous interactions with Dr. Mortimer that *might* render him a patient and which make this analysis more nuanced.[5]

First, Dr. Mortimer did technically "diagnose" Fowler with low sperm count and low motility; however, the alleged medical malpractice was not the result of those interactions and diagnoses, but something else. In other words, Fowler is not claiming that Dr. Mortimer misdiagnosed *him*, did not properly treat *his* condition, or that any harm that came to Fowler was a result of *his* condition. His contention rather is that the

_____

[5] The unique facts of this case present numerous issues of first impression (or at least novel distinctions on well-established principles) as well as intricate legal questions.

medical malpractice *physically* happened to his wife, but that the nature of the procedure (artificial insemination) involved him to such a degree that he was essentially a patient as well.

In order to establish a medical malpractice claim, the plaintiff must establish that: (1) defendant owed a duty, recognized by law, requiring defendant to conform to a certain standard of care; (2) the defendant breached that standard of care;(3) defendant's breach caused the complained of injury; and (4) the injury caused loss or damage. *Schmechel v. Dille*, 219 P.3d 1192, 1203 (Idaho 2009). Whether a duty exists in a particular context is a question of law. *Rountree v. Boise Baseball LLC*, 296 P.3d 373, 377 (Idaho 2013).

Idaho has not had occasion to address the specific question of whether a doctor owes a duty of care in negligence to non-patient third-parties, such as a patient's family members.[6] The only analogous action in Idaho would be that of legal malpractice and the Idaho Supreme Court has definitively held that an attorney-client relationship must be

---

[6] Other jurisdictions have held, however, that a physician-patient relationship is essential to a claim for medical malpractice. A plaintiff must prove the existence of a physician-patient relationship before a duty can be established. *See Jennings v. Badgett*, 230 P.3d 861, 865-66 (Okla. 2010); *Mead v. Legacy Health System*, 283 P.3d 904, 909-10 (Ore. 2010); *Seeber v. Ebeling*, 141 P.3d 1180 (Kan. Ct. App. 2006); *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 2005)(establishing a physician-patient relationship is pre-requisite for a malpractice claim); *Gross v. Burt*, 149 S.W.3d 213 (Tex. Ct. App. 2004); *Millard v. Corrado*, 14 S.W.3d 42 (Mo. Ct. App. 1999); *Roberts v. Hunter*, 465 S.E.2d 797 (S.C. 1993).

established before a person could establish a malpractice claim. *Bishop v. Owens*, 272 P.3d 1247, 1257 (Idaho 2011).

Defendants attempt to liken this case to *Zaleha v. Roshold, Robertson & Tucker, Chtd.*, 953 P.2d 1363 (Idaho 1997), wherein the Idaho Supreme Court determined that an employer did not owe a duty to the spouse of an employee it terminated as she was not a foreseeable victim. Defendants assert that "since the procedure was performed only on Ashby . . . Dr. Mortimer only owed a duty to Ashby for its successful completion." Dkt. 16-1, at 18. The Court disagrees.

First, although Dr. Mortimer and Fowler clearly had a physician-patient relationship as to *his* diagnosis, there was also a physician-patient relationship between Dr. Mortimer and Ashby *and* Fowler (as a couple) as it relates to the artificial insemination procedure. Presumably, there is a signed contract between Dr. Mortimer and Asbhy and Fowler, but even if there is not, while Fowler may not have been a patient for the artificial insemination process in the traditional sense of the word—i.e. that Dr. Mortimer was physically treating him for some condition—he was a patient in the sense that Dr. Mortimer had agreed with him (Fowler) and Ashby to help *them* with their infertility. Moreover, the agreed upon procedure involved the use of Fowler's sperm.

Second, Fowler was not merely a third-party family member in this case; rather, he was an integral part of the procedure. The Court finds this case quite distinguishable from *Zaleha.* There, the Court determined that even though the spouse of a terminated employee might be saddened by her husband's situation, the company did not owe her any duty. The Idaho Supreme Court found the connection between the conduct and the

injury "too tenuous." *Zaleha*, 953 P.2d at 1365. Here, it is difficult to accept the idea that the male spouse in an artificial insemination procedure is not a foreseeable victim if the procedure goes wrong. When a couple pursues artificial insemination, it is a "together" process. Particularly in this case where both Fowler and Ashby's individual conditions contributed to their inability to conceive, the artificial insemination procedure was employed as a remedy for both of their conditions. The success and effects of the process impacted both Fowler and Ashby.

In sum, while the physical aspects of this case might apply solely to Ashby, it is hard to separate Fowler's relationship—his marriage to Ashby—and his role—his sperm for the procedure—from that of Ashby. It is reasonable to conclude that the medical malpractice applies to both Ashby and Fowler. For these reasons, the Court finds that Fowler is a proper party in this case and can proceed.[7]

**B. Idaho Code section 6-1012 and "the gravamen of the claim"**

With a determination as to the appropriate parties in this lawsuit, the Court next turns to the implications of Idaho Code section 6-1012 in this case. Section 6-1012—Medical Malpractice—applies to:

> [A]ny case, claim or action for damages due to injury to or death of any person, brought against physician and surgeon or other provider of health care . . . or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto.

---

[7] As will be outlined below, however, Fowler can only proceed—alongside Ashby—with a medical malpractice claim.

The Idaho Supreme Court has determined that "the language of the statute clearly treats the provision of health care as a single act and not a series of steps, each of which must be analyzed to determine if it involved professional judgment." *Hoover v. Hunter*, 249 P.3d 851, 856 (2011) (*quoting Hough v. Fry,* 131 Idaho 230, 233 (1998)). Because of the unique evidentiary standards set forth in Section 6-1012 for medical malpractice claims—namely that expert testimony is required—if a medical malpractice claim is present in a suit, it precludes most other claims. *Id.* Said differently, the standards of Section 6-1012 apply to the underlying conduct even if the claims alleged are not for medical malpractice.[8] As a threshold matter in each case, the Court must determine "whether the alleged wrongful act or omission occurred in the course of performing professional services" and is therefore a question of malpractice. *Lapham v. Stewart*, 51 P.3d 396, 403 (Idaho 2002). If so, Section 6-1012 exclusively applies.

In short, it does not appear that Section 6-1012 *in and of itself* bars all claims except those for medical malpractice. The statute simply sets out the evidentiary standards for succeeding on a claim that arises out of medical malpractice—i.e. mandatory expert testimony. Thus, if a party wanted to bring another claim, alongside

---

[8] In *Hoover* for example, the plaintiff pleaded a fraud claim. The district court dismissed that claim and the Idaho Supreme Court affirmed, determining that because the claimed injuries were due to the provisions or failure of health care, Section 6-1012 applied and the heightened evidentiary standards had not been met in regards to the fraud claims as no expert witness testimony on this issue had been disclosed.

(Continued)

medical malpractice, *it is plausible* that such a claim could survive; however, the party would have to meet the requirements of Section 6-1012 because the claim arose out of medical malpractice.[9] Oft quoted—here and in numerous Idaho cases—is the reprimand from the Idaho Court of Appeals that "artfully labeling" causes of actions as things other than medical malpractice will not avoid the requirements of Section 6-1012 when the gravamen of the claim is medical malpractice. Again, however, it does not appear that this admonition meant that all claims except for medical malpractice had to be excluded, but rather that labeling a medical malpractice claim as something else just to get around the requirements of Section 6-1012 was inappropriate.

Thus, litigants—and Courts in Idaho—have taken the approach that it is simply easier to have a single medical malpractice claim rather than multiple claims that have to meet the medical malpractice standards because they arose out of the provisions of health care. This—coupled with the fact that the statute is broad enough to encompass anything related to professional health care services—essentially mandates that all causes of action that arise out of the provision of health care be categorized as medical malpractice and all other individual claims be dismissed.

Here, while Plaintiffs have alleged numerous causes of action, each arises out of the same set of circumstances—the artificial insemination procedure Dr. Mortimer

_____

[9] For example: expert testimony is not required in a contract dispute, but in a contract dispute that arose out of "the provision of or failure to provide health care or on account of any matter incidental or related thereto," such testimony would, presumably, be required.

performed in 1980. Because the gravamen of the claims at issue here is medical malpractice, Section 6-1012 applies and all other claims must be dismissed. The fact that Section 6-1012 broadly governs this case is but one of the many reasons that all of Ashby and Fowler's claims—except medical malpractice—must be dismissed. At oral argument, Plaintiffs continued to assert that even if the gravamen was medical malpractice, some of their other claims remain viable.[10] As will be explained below, the Court will only allow Fowler and Ashby to proceed with a medical malpractice claim.

Also at oral argument, Plaintiffs stated that they are no longer pursuing claims related to battery, breach of contract, and the Idaho Consumer Protection Act. In light of this explicit abandonment, the Court DISMISSES each of those three claims and will not discuss them further.

The Court next turns to the remaining claims—other than medical malpractice— and outlines additional, independent reasons why the Court must dismiss each one—i.e. why Plaintiffs cannot proceed with the individual claims alongside their medical malpractice claim.

*(remainder of page intentionally left blank)*

---

[10] It is not entirely clear if this notion rested on the idea that Rowlette or Fowler could bring the claims independently—if the Court determined they could not proceed on medical malpractice claims—or simultaneously with medical malpractice claims.

### C. Claims at issue

#### 1. Fraud

In addition to the plain reading of Section 6-1012, the Idaho Supreme Court has specifically held that claims for fraud cannot be brought in conjunction with malpractice claims. *Hoover*, 249 P.3d at 856.

In *Hoover,* the plaintiff brought claims against a physician for negligent care that resulted in the death of a family member. 249 P.3d at 854. Plaintiff also brought a fraud claim alleging the physician made misrepresentations regarding his diagnosis and treatment. *Id.* The trial court dismissed plaintiff's fraud claim reasoning that since the claims were related to the physician's standard of care, and the claimed damages were for wrongful death, Section 6-1012 governed the matter exclusively. *Id.* The court's basis for dismissing a claim of fraud where the action stems from medical malpractice was founded in a prior decision dismissing a breach of contract claim when the gravamen of the case was malpractice. *Id.; see also Lapham v. Steward*, 51 P.3d 396, 402-03 (Idaho 2002). Similarly, in light of Plaintiffs' medical malpractice claim here, the Court must dismiss their claim for fraud.[11]

#### 2. Emotional Distress Claims

---

[11] Because the Court is dismissing this claim under Section 6-1012 further analysis is not necessary. However, the Court notes that it also appears Plaintiffs would have a difficult time meeting all the elements necessary to prove a fraud claim—particularly reliance and injury.

Plaintiffs allege both intentional infliction of emotional distress and negligent infliction of emotional distress claims in this case. Both, however, are barred for three reasons. First, similar to Plaintiffs' battery claims, the Idaho Supreme Court has specifically held that intentional torts that arise out of the failure to provide adequate health care are to be construed as claims for medical malpractice. *Hall v. Rocky Mountain Emergency Physicians*, 312 P.3d 313 (Idaho 2013).

Second, Plaintiffs' claims are subject to the statute of limitations in Idaho Code section 5-219(4), which limits actions for infliction of emotional distress to 2 years. Claims for intentional and negligent infliction of emotional distress "shall be deemed to have accrued as of the time of the occurrence, act or omission complained of, and the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom." Idaho Code § 5-219(4).

Regarding Defendant's statute of limitations defense, Plaintiffs contend that these claims for emotional distress are continuing torts and that the statute of limitations did not begin to run until the tortious act ceased. Plaintiffs believe that the tortious behavior was not just Dr. Mortimer's use of his own sperm in impregnating Ashby, but his "continued . . . deception" over "several decades" hiding that fact constitutes a continuing tort which caused the emotional distress.

In *Curtis v. Firth*, the Idaho Supreme Court discussed the different ways it has used the term "continuing tort" in Idaho. While extensive, the Court will quote at length from that decision as the differences identified therein set the stage for the case that both

parties rely on here in support of their proposition that Dr. Mortimer's actions were—or were not—a continuing tort.[12]

*\*\**

*Woodland v. Lyon,* 78 Idaho 79, 298 P.2d 380 (1956), discussed a continuing tort in the context of a water right. In that case defendant obstructed a stream bed which prevented water from flowing onto plaintiffs' property for four consecutive years. Plaintiffs then brought suit and ultimately received a jury verdict. On appeal the Court held:

> The tort herein alleged is not a single wrong, but a continuing one, and appellant may, if the evidence supports his claim, recover for all injuries occurring within the statutory period, even though the obstruction occurred more than four years before the complaint was filed.

78 Idaho at 83, 298 P.2d at 381. It is clear that *Woodland* actually referred to *continuing damages* resulting from one tortious act, rather than *continuing acts.* Thus, while *Woodland* discussed a "continuing tort," it was not applied in the same sense as *Farber.*

*Streib v. Veigel,* 109 Idaho 174, 706 P.2d 63 (1985), addressed this troubling concept in the context of a professional malpractice action:

> If A sets a spring gun and two years elapse before B, a police officer, opens the door, has B's cause of action been barred by the statute of limitations? Or is the tort continuing in nature until B is damaged? Clearly the latter result should obtain. In the instant case, also, we hold that the tortious negligence is continuing in nature until plaintiffs suffer damage.

109 Idaho at 179, 706 P.2d at 68.

---

[12] Because there are block quotes within the *Curtis* decision the Court will not make the entire section from *Curtis* a block quote in this decision.

Unlike either *Farber* or *Woodland, Streib* refers to a situation where an act or acts occur but no damages arise for a period of time. This case was the genesis of the "some damage" exception to the plain reading of I.C. § 5–219(4), providing that no cause of action will be deemed to have accrued until "some damage" has occurred.

Thus the Court has used the words "continuing" and "tort" in three separate and very different contexts. Our task in the instant case is to determine which, if any, of those interpretations apply here. "Continuing tort" has been defined as:

> one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation, ...

54 C.J.S. *Limitations of Actions* § 177, at 231 (1987). This definition would seem to be more in line with the term as it was used in *Farber,* than the other two cases cited above. *Curtis v. Firth*, 850 P.2d 749, 753–54 (1993).

***

Here, Dr. Mortimer's actions most closely mirror the acts in *Streib* where an action occurs, but no damages arises for a period of time. Morimer's act was singular—or at the very most—occurred continuously, but only through August 1980—and thus the statute of limitations began to run in August of 1980.

Plaintiffs argument that Dr. Mortimer's "deception" was the continuing tort— rather than the procedure itself—is not supported by relevant caselaw. In *Glaze v. Deffenbaugh*, two sisters brought battery claims against their father for offensive sexual acts that occurred 25 years prior to their filing suit. The girls tried to liken their case to

*Curtis*, and—like Plaintiffs today—asserted that their ongoing relationship with their father and his concealment constituted a "continuing violation." The *Glaze* Court found that this argument was "without merit," and that the "wrongful acts alleged to have been committed against them . . . ceased in 1979 [the year the molestation ended]." 172 P.3d 1104, 1108 (Idaho 2007).

Importantly, the Court in *Glaze* noted that "the daughters present no authority for the proposition that silence or concealment under these circumstances constitutes a wrongful act giving rise to a continuing claim for intentional infliction of emotional distress." *Id.*

A similar situation is before the Court today. Plaintiffs have not presented any persuasive authority that would suggest the Court should view Dr. Mortimer's silence for the past 38 years as a continuing tort.

Plaintiffs' cannot bring their emotional distress claims due to the provisions of Section 6-1012, and because each is barred by the statute of limitations and not a continuing tort that demands tolling. For all these reasons, the Court will dismiss Plaintiffs' intentional infliction of emotional distress claim and negligent infliction of emotional distress claim.

### 3.  Lack of Informed Consent

Defendants acknowledge that unlike some of the prior claims at issue, Plaintiffs' lack of informed consent claim is not barred by Section 6-1012 and can coexist with a

medical malpractice claim.[13] Be that as it may, the statute of limitations has run on this claim as well.

Claims for injuries arising from informed consent must be commenced within two (2) years of the act, occurrence or omission complained of. Idaho Code § 5-219(4). Plaintiffs' claim here that the doctrine of fraudulent concealment has tolled the statute of limitations on this claim. However, as will be discussed below, this exception only applies to claims of medical malpractice. *Glaze*, 172 P.3d at 1107.

Here, the lack of consent—or nondisclosure—occurred when Dr. Mortimer used his own sperm without Plaintiffs' knowledge in 1980 during the artificial insemination procedure and thus any claim for lack of consent expired in 1982. The Court finds that the statute of limitations bars Plaintiffs' lack of informed consent claim.

The Court now turns to the crux of this case: medical malpractice.

### 4. Medical Malpractice

Defendants claim that, like the prior claims, the statute of limitations bars Plaintiffs' medical malpractice claim in this case. Under Idaho Code section 5-219(4), an action to recover damages for medical malpractice must be commenced within two (2) years from the occurrence, act, or omission complained of.

---

[13] *Foster v. Traul,* 120 P.3d at 278, 282 (Idaho 2005) (holding physician may be held liable under the doctrine of informed consent even if there was no negligence in the treatment of the patient).

Plaintiffs assert that the statute has been "tolled" under various theories. Furthermore, under Section 6-1012, the elements of medical malpractice—duty, breach, and causation—must be established by expert testimony. In other words, there is no way to know—at this stage of the case—whether a duty existed or a breach occurred. Plaintiffs urge the Court to allow this claim to proceed as material outside of the pleadings would have to be considered in order to rule on this claim. The Court agrees with this proposition.

Aside from the elements of the claim, the Court must still address whether any principal of tolling has occurred sufficient to allow this claim to proceed at all. The Court finds that, under the allegations in the Complaint, the statute of limitations has been tolled in this case, and therefore, the Court cannot, at this stage, dismiss the action. Accordingly, Plaintiffs Fowler and Ashby will be allowed to proceed with their medical malpractice claim.

### D. Plaintiffs Counter-Arguments

Plaintiffs contend that all the statutes of limitations have been tolled by either fraudulent concealment, equitable estoppel, and/or the "some damages" principle. As the Court has already determined that only Plaintiffs' medical malpractice claim may proceed, however, the Court will only discuss these arguments as they relate to that claim.

### 1. Equitable Estoppel

First, Plaintiffs assert that equitable estoppel prohibits Defendants from relying on the various statutes of limitation because they concealed material facts. Idaho Courts

have long recognized that a party can be estopped from pleading a statute of limitations

defense when the defendant's own actions prevented the discovery of the harm in time to

bring a claim within the time permitted by statute. *See e.g. Twin Falls Clinic & Hospital*

*Building Corp. v. Hamill*, 644 P.2d 341. Plaintiffs correctly identify the standard for

equitable estoppel,[14] but fail to articulate how Dr. Mortimer's conduct qualifies for this

exception other than to say that "this case is a prime example of why the courts have

adopted the principles of equitable estoppel to secure justice for aggrieved parties." Dkt.

29, at 13. Importantly, Plaintiffs have failed to establish that they suffered prejudice

because of any act or representation made by Dr. Mortimer.

To establish prejudice, a plaintiff must prove that they relied on a defendant's false

representation or concealment to such a degree that they changed their conduct based on

that misrepresentation. *Willig v. State, Dept. of Health & Welfare*, 899 P.2d 969, 971

(Idaho 1995). Moreover, the change of conduct must have caused plaintiff material and

substantial injury. *Id.*; *Boesiger v. Freer*, 381 P.2d 802, 808 (Idaho 1963). In layman's

terms, equitable estoppel prohibits a person from taking a position that conflicts with

previous claims or behavior and upon which a third party relied. In the present matter,

---

[14] "Four elements are required in order to establish a claim for equitable estoppel: 1) there must
be a false representation or concealment of a material fact made with actual or constructive
knowledge of the truth; 2) the party asserting estoppel did not and could not have discovered the
truth; 3) there was intent that the misrepresentation be relied upon; and 4) the party asserting
estoppel relied upon the misrepresentation or concealment to his or her prejudice." *Sorensen v.
Saint Alphonsus Reg'l Med. Ctr., Inc.*, 118 P.3d 86, 91 (Idaho 2005).

however, Plaintiffs have not identified any action that Dr. Mortimer took that caused

them to alter their conduct or that resulted in any material or substantial harm. It appears

that Plaintiffs are alleging the negative inference—that had Dr. Mortimer (in 1980)

affirmatively disclosed that the sperm he was using was his rather than an anonymous

donor, they would have changed their behavior and not gone forward with the procedure.

In short, plaintiffs have failed to show how equitable estoppel applies in this case.

### 2. Fraudulent Concealment

As noted above, fraudulent concealment only applies to claims of medical

malpractice. *See Glaze*, 172 P.3d at 1107. Plaintiffs, however, continue to assert that

fraudulent concealment applies to each of their claims and that the Court should analyze

whether each claim has been tolled. Plaintiffs' argue that the caselaw proffered by

Defendants limiting this defense—specifically one phrase relied upon—is merely dicta

and was "not crafted thoughtfully." The Court disagrees.

In determining whether the fraudulent concealment exception applied, the *Glaze*

Court stated that the exception "applies to professional malpractice claims, not claims of

the nature alleged in this case." *Id.* The logical question then is: what were the claims

alleged in that case? In *Glaze*, Plaintiffs had alleged lewd conduct, negligence, fraud, and

emotional distress.

Idaho Code section 5-219(4) allows for the fraudulent concealment exception

when a claim arises from a professional relationship. This concept, however, is the

precise reason that Idaho Courts look to the gravamen of the claim to determine if there

was a professional relationship at issue and then determine what claims are appropriate.

If, like here, the gravamen is medical malpractice, then all other claims are precluded and consequently, the exception only applies to that claim—i.e. medical malpractice. In short, the language the Court used in *Glaze* was not just a passing, thoughtless phrase, but an accurate reflection of the law in Idaho.

The Court now turns to the substance of the fraudulent concealment exception. Idaho Code section 5-219(4) provides two exceptions related to when a cause of action begins to accrue: when a foreign object is left in a patient's body and when the fact of damage is fraudulently and knowingly concealed from the patient. An action brought under the fraudulent concealment exception must be commenced within one (1) year following the date of accrual. *Id.*

When the fraudulent concealment exception applies, the cause of action begins to accrue "when the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of." Idaho Code 5-219(4). Importantly, the Idaho Supreme Court has made a distinction between when the injured party knows of the alleged malpractice and when the injured party knows the fact of damage. *Bliss Valley Foods, Inc. v. Walker*, 896 P.2d 338, 341 (Idaho 1998). The limitation contained in the concealment exception begins to run at the time of the former—when the party knew, or should have known, about the malpractice, not when they knew, or should have known, of the resulting damages.

Here, as noted before, it is difficult to know what legally cognizant injury has occurred. However, that inquiry is not before the Court at this time. The relevant question is when did Folwer and Ashby "know[] or in the exercise of reasonable care should

[they] have been put on inquiry regarding the matter complained of." Idaho Code 5-219(4). As will be explained below, the Court does not know exactly when Plaintiffs could have determined their injury. Accordingly, fraudulent concealment *may* be a valid defense to the statute of limitations on Plaintiffs' medical malpractice claims—the Court simply does not know.[15] A motion to dismiss based on a statute of limitations should be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled. *Kindschy v. Berryhill,* 2018 WL 1583135 (D. Idaho 2018). Therefore, the Court cannot dismiss the Complaint or enter judgment on the pleadings in Defendant's favor. This is a factual issue for the jury.[16]

### 3. Some Damage

Finally, Plaintiffs assert that their claims are not barred by the statute of limitations because each did not accrue until they suffered "some damage." Citing *Lapham v. Stewart*, Plaintiffs claim that "until some damage occurs, a cause of action for professional malpractice does not accrue." 51 P.3d 396, 400 (Idaho 2002). Plaintiffs' contend that they did not suffer any damage until they learned of Dr. Mortimer's

---

[15] Here, the additional year means that Plaintiffs were required to file this case within one year of when they knew (or reasonably should have known) of the injury.

[16] *See, Singleton v. Foster,* 559 P.2d 765 (Idaho 1977) ("Motions to dismiss complaints on the basis of statutes of limitations are generally viewed with disfavor. . . . There are, however, numerous reasons why the statute may have been tolled which under the holding of *Duff v. Draper, supra,* need not have been expressly set forth in the Complaint.").

"violation of their trust" in 2017 when they discovered that he was Rowlette's biological father.

Defendant's argue that Plaintiffs' position is essentially a "discovery rule" which has been rejected in Idaho. In *Conner v. Hodges*, the Idaho Supreme Court explained that:

> [W]hen determining whether 'some damage' has occurred, the trial court is to identify the point at which the 'fact of injury becomes objectively ascertainable.' By 'objectively ascertainable,' 'we mean that objective medical proof would support the existence of an actual injury.' The concept of an 'objectively ascertainable injury' is simply an analytical tool to be used in determining when 'some damage' has occurred.

333 P.3d 131, 135 (Idaho 2014) (internal secondary quotations marks and citations omitted).

In *Stuard v. Jorgenson*, the Idaho Supreme Court expressly rejected the argument that damages do not accrue until the damage is discovered.

> The language of *Davis* defining "objectively ascertainable" to mean "that objective medical proof would support the existence of an actual injury," means that the existence of the injury is capable of being objectively ascertained. *Davis*, 112 Idaho at 709 n. 4, 735 P.2d at 1020 n. 4. *To allow for accrual to begin only once the parties have been put on notice of the damage, or in other words, once the damage is actually "ascertained" would effectively create a discovery rule, which the legislature has rejected.*

249 P.3d 1156, 1161 (2011) (emphasis added).

In *Stuard*, a physician performed a spinal surgery at the wrong level. *Id*. at 702. Despite this, the operation relieved the plaintiff's symptoms and the Plaintiff only discovered the error two years later when another MRI was performed. *Id.* at 703. The district court in *Stuard* found that the medical malpractice claim was time barred under

Idaho Code section 5-129(4). *Id.* The Idaho Supreme Court affirmed, explaining that the "removal of healthy tissue and the installation of hardware at the wrong level," was objectively ascertainable at the time of the negligently performed surgery "because had objective medical proof in the form of an MRI been ordered, it would have shown that the surgery was performed at the wrong level, and that Stuard had suffered damages as a result of its performance at the wrong level." *Id.* at 706.

Conversely, in *Conner v. Hodges*, the Idaho Supreme Court found that a woman who unexpectedly became pregnant after have a tubal ligation *could* pursue a medical malpractice claim against her doctor—even though the two year statute of limitations had run—because the suggested medical methods for objectively ascertaining the injury were invasive, painful, risky, costly, and had no medical justification at the time of the incident. [17] 333 P.3d at 136.

Additionally, in *Wyman v. Eck*, 390 P.3d 449 (Idaho 2017), Plaintiff Wyman sought medical attention for a growth on his heel. The first doctor he went to diagnosed the growth as an infected wart. After the condition failed to improve—even after the "wart" was removed—Wyman went to another Doctor for a biopsy. This second doctor discovered that the growth was not a wart, but rather cancer. The Idaho Supreme Court held that while it was a "harsh result[]," the cancer was objectively ascertainable when

---

[17] In *Conner*, the Plaintiff offered medical affidavits contradicting Defendant Hodges' opinions that two medical tests could have easily determined the extent of the injury. In light of these competing opinions, the Idaho Supreme Court determined that it was not objectively ascertainable as the suggested medical procedures were not routine—like the MRI in *Stuard*.

Wyman first experienced his symptoms because the original doctor *could* have performed a biopsy which would have revealed the cancer. The Supreme Court held that "the fact that the biopsy was not performed until [later] is irrelevant. Holding that [Wyman's] cancer became objectively ascertainable only when the biopsy actually revealed cancer would equate to applying a discovery rule, which has been consistently rejected." *Id.* at 452.

In this case, Defendants assert that Plaintiffs' damages were objectively ascertainable at any point after the artificial insemination procedure via DNA testing. The Court disagrees. While DNA testing performed at any point after the artificial insemination procedures would have revealed that Fowler *was not* Rowlette's father, it would not have conclusively determined that Dr. Mortimer *was*. This realization was not "objectively ascertainable" until Dr. Mortimer allowed Ancestry.com to publish his DNA results. Only at that point could Rowlette ascertain that Dr. Mortimer—not just someone other than Fowler—was her biological father. Thus, *in this case*, the statute of limitations on the medical malpractice claim did not begin to run until at least the point at which Dr. Mortimer published his DNA results. Because the Court does not know the point at which this occurred, it cannot rule on the applicability of this defense and whether the statute of limitations has run on the medical malpractice claims.

Finally, Plaintiffs contention that they never suspected Dr. Mortimer used his own sperm is understandable; however, it misses the mark. While Plaintiff's never suspected that *Dr. Mortimer* was the donor, they understood that 85% of the sperm used in the procedure was Fowler's but 15% came from another individual. In short, they understood

Rowlette's paternity was not settled. Frankly, there was no way to know—absent testing—whose DNA (Fowler's or the donor's) ultimately caused the successful pregnancy. It is, therefore, not unreasonable to suggest that a couple under such circumstances might "suspect," or have reason to perform DNA testing to determine who their child's biological father is. Plaintiffs' contention that they had "no reason whatsoever" to do DNA testing is somewhat disingenuous.

## V. CONCLUSION

The facts of this case—if construed as true—paint a picture of troubling conduct carried out by a person in a position of trust. Plaintiffs' anger concerning the alleged misconduct is understandable and while there may be valid public policy arguments to be made, each claim must meet strict legal requirements to survive a Motion to Dismiss. Here, Plaintiffs have largely failed to meet those requirements in relation to most of their causes of action.

Under Section 6-1012, the facts of this case sound in medical malpractice and because of the heightened standards of proof required in such a case, the Court must dismiss all other claims. Additionally, each claim is independently barred—other than medical malpractice—by its applicable statute of limitations or other relevant caselaw.

Finally, Plaintiffs' medical malpractice claims survive a motion to dismiss but must still overcome the high hurdle of the statute of limitations once discovery has occurred and a motion for summary judgment filed. There are simply too many facts missing from the current record (i.e. the Complaint) for the Court to determine when the statute of limitations began to run in this case and whether or not it has been tolled.

## VI. ORDER

The Court HEREBY ORDERS:

1.  Defendant Linda Mortimer is DISMISSED as an improper party.

2.  Plaintiff Kelli Rowlette is DISMISSED as an improper party.

3.  Defendant Dr. Mortimer's Motion to Dismiss (Dkt. 16) is GRANTED IN PART and DENIED IN PART. The Court will dismiss all claims except for medical malpractice.

4.  Defendant OGA's Motion to Dismiss (Dkt. 17) is likewise GRANTED IN PART and DENIED IN PART consistent with the above analysis. Only a claim of medical malpractice as to Ashby and Fowler (and therefore OGA) may proceed.

DATED: October 25, 2018

David C. Nye
U.S. District Court Judge