Case 4:18-cv-00143-DCN   Document 49-13   Filed 04/05/19   Page 1 of 3

| ROWLETTE, et al. vs.<br>MORTIMER, M.D., et al. | Video Deposition | GERALD E. MORTIMER, M.D.<br>December 11, 2018 |

**Page 25**

1  A. Yes. Today.
2  Q. Okay. Are you aware of what those
3  changes are?
4  A. I -- I believe there was a change in --
5  in a -- in a statement that I made that --
6  THE WITNESS: I have to refresh my memory.
7  MR. POWERS: He gets to ask the questions.
8  Q. BY MR. MEEHAN: What statement had you
9  made that needed to be changed?
10 A. I needed to --
11 THE WITNESS: Help me with this.
12 MR. POWERS: I can't. I can't help you. You
13 need to do your best to try to --
14 THE WITNESS: Okay.
15 MR. POWERS: -- answer the questions.
16 THE WITNESS: Ask me -- ask me the question
17 again, please.
18 MR. POWERS: Pay attention to the question.
19 THE WITNESS: Okay.
20 Q. BY MR. MEEHAN: You said that you needed
21 to make a change in a statement you had made. What
22 statement had you made that needed to be changed?
23 A. I needed to change the fact that I
24 had -- that I had been a donor.
25 Q. So previously you had stated that you

**Page 26**

1  had not been a donor?
2  A. That's correct.
3  Q. And that wasn't true?
4  A. That was not true.
5  Q. And you knew at the time you made that
6  statement that it wasn't true?
7  A. That's correct.
8  Q. So you had lied?
9  A. Yes.
10 Q. Now, do you understand that you are
11 under oath today?
12 A. Yes.
13 Q. And do you understand that being under
14 oath means that you have sworn that you will tell the
15 truth today?
16 A. I understand that.
17 Q. What does telling the truth mean to you?
18 A. That I need to tell you, from the best
19 of my memory and recollection -- recollection, the
20 things that I know to be correct or true; that I
21 should not lie to you in any way.
22 Q. Why did you lie previously?
23 A. I was ashamed, or -- you know.
24 Q. Why were you ashamed?
25 A. Well, I -- I -- I regret the fact that

**Page 27**

1  I -- that I was a sperm donor; that I did those
2  things in the past. I guess I feel -- I feel bad
3  about that. I wish -- I wish I hadn't done it.
4  Q. As you sit here today, do you understand
5  that what you did was wrong?
6  A. Yes.
7  Q. And, as you sit here today, do you
8  understand how the wrong thing that you did could
9  cause somebody emotional distress?
10 A. Yes. I understand that.
11 Q. Do you understand that finding out that
12 your trusted physician inseminated you with his own
13 semen without your knowledge could cause emotional
14 distress?
15 A. Yes.
16 Q. Okay. And do you understand how being
17 the husband of a person whose physician inseminated
18 them with his own semen could cause distress?
19 A. Yes.
20 Q. Do you understand that, as a child --
21 that finding out that the man that you thought was
22 your father is not actually your biological father
23 could cause emotional distress?
24 A. Yes.
25 Q. Can you understand, as you sit here

**Page 28**

1  today, that finding out that not only is your father
2  not your biological father but that you are the
3  result of your mother being inseminated with her
4  physician's own semen without her knowledge could
5  cause additional distress?
6  A. Yes.
7  Q. If I told you that the events that bring
8  us here today caused Sally Ashby severe emotional
9  distress, would you have any reason to dispute that?
10 A. No.
11 Q. If I told you that the events that bring
12 us here today caused Howard Fowler severe emotional
13 distress, would you have any reason to dispute that?
14 A. No.
15 Q. If I told you that the events that
16 brought us here today caused Kelli Rowlette severe
17 emotional distress, would you have any reason to
18 dispute that?
19 A. No.
20 Q. Is it truthful to say that you don't
21 remember something when you actually do remember it?
22 A. That's not truthful.
23 Q. Okay. Are you taking any medications
24 today that would prevent you from giving honest and
25 truthful answers?

Case 4:18-cv-00143-DCN   Document 49-13   Filed 04/05/19   Page 2 of 3

| ROWLETTE, et al. vs.<br>MORTIMER, M.D., et al. | Video Deposition | GERALD E. MORTIMER, M.D.<br>December 11, 2018 |

**Page 133**

1 line where it states, "Dr. Mortimer admits that
2 contained in Ms. Ashby's medical records are
3 pathology results on Mr. Fowler's sperm."
4   A. Okay.
5   Q. Is that accurate?
6   A. Yes.
7   Q. Okay. Do you recall whether you
8 diagnosed Mr. Fowler with low sperm motility?
9   A. Based on the lab report.
10   Q. You did?
11   A. Yes.
12   Q. And you ordered the lab report, correct?
13   A. Yes. Yes.
14   Q. And you just testified that you didn't
15 order laboratory testing except for patients,
16 correct?
17   A. Well, I think this is related to my
18 patient and has to do with my patient.
19   Q. But the diagnosis was with regard to
20 Howard Fowler, correct?
21   A. That's correct.
22   Q. And when you diagnose somebody, they're
23 your patient, correct?
24   A. Yes.
25   Q. So -- and you offered a diagnosis to

**Page 134**

1 Howard Fowler, correct?
2   A. Yes.
3   Q. And that would make Howard Fowler your
4 patient, wouldn't it?
5   A. Yes.
6   Q. So the places where you state that
7 Howard Fowler is not your patient are inaccurate,
8 correct?
9   A. Based on that.
10   Q. You would agree with me that they're
11 inaccurate?
12   A. Well, based on what we just discussed.
13   Q. So if it says that he was -- if it says
14 Howard Fowler was not your patient, that's not the
15 truth, is it?
16   A. It's not.
17   Q. Okay. Thank you.
18       I'd ask that you turn to page 8, Request
19 for Admission No. 32.
20       Would you please read Request for
21 Admission No. 32 for the record.
22   A. "Dr. R. Douglas Isbell did not try to
23 stop you from using your own semen to inseminate
24 patients."
25   Q. Okay. And it is, in fact, true that

**Page 135**

1 Dr. R. Douglas Isbell did not try to stop you from
2 using your own semen to inseminate patients?
3   A. That is true.
4   Q. In your response, it says -- it's the
5 last sentence -- "Based on the wording of the
6 request, Dr. Mortimer cannot admit or deny the
7 request."
8       From what I understand, your testimony
9 is that you admit Dr. R. Douglas Isbell did not try
10 to stop you from using your own semen to inseminate
11 patients; is that right?
12   A. That's what I said.
13   Q. Is you admit that?
14   A. Yes.
15   Q. Okay. So the response to Request for
16 Admission No. 32 is not accurate, correct?
17   A. That's correct.
18   Q. I ask that you look at Request for
19 Admission No. 63. It says, "You did not tell Sally
20 Ashby that you were inseminating her with your own
21 sperm before you did so."
22       Do you see that?
23   A. Yes.
24   Q. And you admit that? As you sit here
25 today, you admit that?

**Page 136**

1   A. I did not tell her.
2   Q. Correct. Okay. Was it an accepted
3 practice for someone board-certified in obstetrics
4 and gynecology with like-experience to you in Idaho
5 Falls, Idaho in 1980 to inseminate a patient with his
6 own sperm without the patient's consent?
7   A. That would not be proper without the
8 patient's consent.
9   Q. Okay. On page 19 of Exhibit *-17, you
10 signed a verification notarized by Mr. Hall, correct?
11   A. That's correct.
12   Q. And that says that, under oath, being
13 first duly sworn and upon oath, that you had read the
14 foregoing responses to request for admission, knows
15 the contents thereof and believes the same to be
16 true?
17   A. That's correct.
18   Q. That's correct that that's what it says,
19 but it wasn't true, was it?
20   A. It's not true.
21   Q. Do you believe Mr. Hall had reason to
22 know that was not true when he notarized that
23 document?
24       MR. HALL: Objection. Calls for invasion of
25 the attorney-client privilege.

Case 4:18-cv-00143-DCN   Document 49-13   Filed 04/05/19   Page 3 of 3

| ROWLETTE, et al. vs. MORTIMER, M.D., et al. | Video Deposition | GERALD E. MORTIMER, M.D. December 11, 2018 |

**Page 137**

MR. POWERS: I'll join in that. You've been instructed not to answer that.

(Exhibit *-18A marked.)

MR. MEEHAN: Now, let's mark that actually as *-18A, please. And we will mark this one as *-18B.

(Exhibit *-18B marked.)

Q. BY MR. MEEHAN: Now, do you recognize what's been marked as *-18A as your amended responses to plaintiffs' first set of requests for admission?

A. It looks correct to me.

Q. Okay. And is the verification that has been marked as Exhibit *-18B your verification that those amended responses have been read by you and that you know the contents thereof and believe the same to be true?

A. That's correct. I've signed it.

Q. Okay. And did you actually read your amended responses to plaintiffs' first set of requests for admissions before signing the verification?

A. I didn't read every word, but I looked through.

Q. Did you read all of the bolded words that were added as the amendment to your admissions

**Page 138**

and denials?

A. I believe I did. I believe - I believe I read the -- the dark.

Q. Are all of the statements in the dark type, the bolded amended type, true and accurate as we sit here today?

A. Okay.

Q. Are all of those bolded statements true and correct as we sit here today?

A. As near as I can tell without -- without extensive study -- but as near as I can tell flipping from one page to another, they look like they're correct.

Q. You said earlier that when you delivered Kelli Fowler, now Kelli Rowlette, that you knew that you were delivering your own child. Do you recall that testimony?

A. Yes.

Q. So if you knew that you were delivering your own child, you would have known that you inseminated that child's mother, correct?

A. Yes.

Q. So you had a specific recollection of having inseminated Sally Ashby, then Fowler, correct?

A. Yes.

**Page 139**

Q. So looking at page 9, Amended Response to Request for Admission No. 63, do you see there where you have stated and verified under oath, quote, "Dr. Mortimer has no specific recollection of using his own sperm to inseminate Ms. Ashby," end quote?

A. This bolded statement?

Q. Yes. And do you see specifically where, in that bolded statement on Amended Response to Request for Admission No. 63 -- do you see where as part of that you state, quote, "Dr. Mortimer has no specific recollection of using his own sperm to inseminate Ms. Ashby"?

A. Well, at the time -- since all of this has come out and that, it's become clear that I did.

Q. But even at the time Kelli Fowler, now Kelli Rowlette, was born, you had a specific recollection of having inseminated her mother, didn't you?

A. I did.

Q. And so this statement that you certified as being true today is, in fact, not true?

A. It looks like it's not true.

MR. MEEHAN: Why don't we take a brief break before I jump into this.

MR. POWERS: Okay. We can do that.

**Page 140**

(A recess was taken from 2:26 p.m. to 2:34 p.m.)

(Exhibit *-19 marked.)

Q. BY MR. MEEHAN: You have been provided with a set of documents marked as Exhibit *-19. Do you recognize these as being the medical records that you produced to the plaintiffs in this case with your initial disclosures?

A. As far as I know, yes.

Q. And I just want to go through these. The first page -- tell me, what is the first page of the records?

A. It's patient's history and physical.

Q. Okay. And the portion -- the handwriting in section 1 --

A. Section 1?

Q. I'm looking at the first page of the exhibit.

A. This page right here?

Q. No. The first page of the exhibit.

A. On this page right here?

Q. Yes.

A. Oh, okay.

Q. The handwriting in section 1, do you have a belief as to whose handwriting that is?