UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SALLY ASHBY, an individual, and HOWARD FOWLER, an individual, | Case No. 4:18-cv-00143-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| GERALD MORTIMER, M.D., and OBSTETRICS AND GYNECOLOGY ASSOCIATES OF IDAHO FALLS, P.A., an Idaho professional corporation, | |
| Defendants. | |

## I. INTRODUCTION

Before the Court is Defendant Gerald Mortimer M.D.'s Motion for Summary Judgment (Dkt. 49); Defendant Obstetrics and Gynecology Associates of Idaho Falls, P.A.'s ("OGA") Motion for Summary Judgment (Dkt. 50); Plaintiffs Sally Ashby and Howard Fowler's ("Plaintiffs") Motion to Amend Complaint to Include Prayer for Punitive Damages (Dkt. 53); Dr. Mortimer's Motion to Strike Declaration of Plaintiffs' Expert (Dkt. 66); and Plaintiffs' Motion for Summary Judgment (Dkt. 72). The Court heard oral argument on the motions on September 23, 2019. For the reasons stated herein, the Court will DENY Dr. Mortimer's Motion for Summary Judgment, GRANT OGA's Motion for Summary Judgment, GRANT Plaintiffs' Motion to Amend, GRANT in part and DENY in

part Dr. Mortimer's Motion to Strike, and GRANT Plaintiffs' Motion for Summary Judgment.

## II. BACKGROUND[1]

### A. Factual Background

Plaintiffs are a formerly married couple who struggled to conceive between 1973 and 1978. In 1978, Plaintiffs contacted an adoption agency to have their names placed on an adoption list. When they were told it could take as long as four years for a child to become available for adoption, Plaintiffs decided adoption would be a backup plan, and sought fertility treatment from Defendant OGA, under the care of Dr. Mortimer, an OB/GYN.

In order to assist the couple, Dr. Mortimer recorded Ashby and Fowler's relevant medical history, performed physical examinations of Ashby, ordered multiple lab tests for Fowler, and ultimately diagnosed Ashby with a tipped uterus and Fowler with a low-sperm count and low-sperm motility. To address such fertility issues, Dr. Mortimer prescribed Clomid and first recommended artificial insemination using Fowler's semen. The couple agreed, and the procedure was performed two to three times a month for six to eight months. As a result of the Clomid, Fowler's sperm motility increased from 30% to 50%, and his sperm count increased from 5 million to 35 million. However, when artificial insemination using Fowler's semen did not result in conception, Dr. Mortimer suggested that the couple undergo a form of artificial insemination in which donor semen from an

---

[1] Unless otherwise referenced, the following facts are undisputed.

anonymous donor would be mixed with Fowler's semen in a lab prior to insemination to increase the chances of conception. The couple agreed and were told that Fowler's semen would be mixed with the donor semen in an 85%/15% ratio.[2] Plaintiffs understood that there was a chance conception could result from the donor sperm and identified certain requirements for the donor.[3] Plaintiffs also insisted on anonymity so that no one would know they had used artificial insemination, so they would not know the donor and the donor would not know them, and so they could consider any resulting child to be their baby. Dkt. 49-4, Ex. A at 40:3-25.

Dr. Mortimer performed the artificial insemination procedure on various occasions in June, July, and August of 1980. In September 1980, Ashby discovered she was pregnant. Plaintiffs were thrilled when Ashby gave birth to daughter Kelli Rowlette on May 20, 1981. Two years after Rowlette's birth, Plaintiffs were able to naturally conceive a son without any medical intervention. Ashby went to Dr. Mortimer for the prenatal care and delivery of her son, and brought Rowlette with her to "every appointment" she had with Dr. Mortimer. Dkt. 63-5, Ex. C at 90:17-20.

Many years later, Rowlette received notification from Ancestry.com that a DNA

---

[2] Plaintiffs thus believed there was 1/6 chance that any resulting conception could be from the donor sperm, rather than from Fowler. Dkt. 49-5, Ex. B at 82:1-18.

[3] Plaintiffs requested that any donor look as much like Fowler as possible, including having his height, hair and eye color. Dkt. 49-4, Ex. A at 41:1-25. Plaintiffs also sought a donor who was college-educated, under 40, and free from any health issues such as HIV. *Id*. at 44:12-25; 45:1-7; 46:1-16. Plaintiffs claim Dr. Mortimer assured them he had an available donor with such characteristics. *Id*. at 48:9-15; 49:1-11. Dr. Mortimer disagrees that he made such representations because donor semen was difficult to obtain during the relevant time period. Dkt. 61, at 4.

sample she had submitted matched a sample submitted by Dr. Mortimer. Ancestry.com predicted there was a parent-child relationship between the two individuals based upon the samples it had reviewed. Rowlette did not know Dr. Mortimer and was completely unaware that her parents had undergone artificial insemination to help them conceive. When Rowlette first confronted Ashby, Ashby was in shock and claimed it must be a mistake. Realizing Dr. Mortimer must have used his own semen to inseminate her, Ashby felt like she had been raped by her doctor. *Id*. at 82:21-25; 83:1-5. Although they initially kept it from Rowlette because they believed "it would destroy her," Plaintiffs ultimately divulged the truth. Dkt. 49-4, Ex. A at 84:13-21. The three subsequently brought the instant suit alleging that, instead of using a mix of semen from Fowler and an anonymous donor, Dr. Mortimer used his own semen to inseminate Ashby.[4]

Although he initially denied it, Dr. Mortimer has since admitted that he inseminated Ashby with his own semen and that he is Rowlette's biological father. Dr. Mortimer also admitted he used his own semen a number of times during his almost 30-year practice with OGA to inseminate other patients who were having fertility problems. He suggests he did so out of concern for patients and his personal desire to help them conceive. Dr. Mortimer did not inform anyone at OGA that he was using, or had used, his semen to artificially inseminate patients, and no one at OGA was aware of his conduct. Because he feared that he would be discovered, Dr. Mortimer eventually stopped using his own semen to

---

[4] It is unclear from the record whether Dr. Mortimer used solely his own semen, or a mixture of his own semen and Fowler's to inseminate Ashby. Regardless, the parties appear to agree Dr. Mortimer is Rowlette's biological father.

inseminate his patients when DNA testing became more widespread through internet companies such as Ancestry.com.

## B. Procedural Background

Plaintiffs and Rowlette filed their Complaint in this matter on March 30, 2018, against Dr. Mortimer, his wife, and OGA. Although the Complaint alleged eight causes of action—medical malpractice, lack of informed consent, fraud, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, breach of contract, and violation of Idaho's Consumer Protection Act—Plaintiffs later voluntarily dismissed the battery, breach of contract, and Idaho Consumer Protection Act claims. Following Motions to Dismiss by Dr. Mortimer and OGA, the Court dismissed Rowlette as a plaintiff and Ms. Mortimer as a defendant, and also dismissed each of Plaintiffs' remaining claims except for their claim for medical malpractice.[5]

On April 5, 2019, Dr. Mortimer filed a Motion for Summary Judgment (Dkt. 49) arguing this suit should be dismissed in its entirety because Plaintiffs cannot establish the causation and damages elements of a medical malpractice claim. OGA filed its own Motion for Summary Judgment on April 8, 2019. Dkt. 50. On April 10, 2019, Plaintiffs followed with a Motion to Amend/Correct Complaint to Include a Prayer for Punitive Damages. Dkt. 53. Plaintiffs' Reply in Support of their Motion to Amend included a declaration from

---

[5] Because of the unique evidentiary standards set forth in Idaho's medical malpractice statute—namely that expert testimony is required—if a medical malpractice claim is present in a suit, it precludes most other claims. *Hoover v. Hunter*, 249 P.3d 851, 856 (Idaho 2011); *see also* Idaho Code § 6-1012. The Court's determination that Plaintiffs' other claims were subsumed by their medical malpractice claim is outlined in the Court's Memorandum Decision and Order granting in part and denying in part Defendants' Motion to Dismiss. Dkt. 40.

Plaintiffs' expert, Dr. Lee Parsons. Because the declaration purportedly contained conclusions not included in Dr. Parsons' expert report, Dr. Mortimer moved to strike Dr. Parsons' declaration on May 20, 2019. Dkt. 66. Finally, on July 5, 2019, Plaintiffs filed a Motion for Partial Summary Judgment. Dkt. 72. The Court heard oral argument on all of the pending motions on September 23, 2019.

## III. LEGAL STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides that judgment shall be granted if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment. *Id*. An issue is "material" if it affects the outcome of the litigation. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). That is, a material fact is one that is relevant to an element of a claim or defense which might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id*. (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)).

On the other hand, an issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn*, 523 F.2d at 464 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, *Inc*., 391 U.S. 253, 289 (1968)). Because factual disputes are

to be decided at trial, in ruling on summary judgment motions, the Court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. Further, all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Id*. at 631.

Finally, where, as here, the parties both move for summary judgment, the Court will consider each motion on its own merits. *Fair Housing Council of Riverside Cty., Inc., v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In ruling on cross-motions, the Court will consider the entirety of each party's evidentiary submission, regardless of which motion (or opposition) the evidence accompanied. *Id*. at 1136-37.

## IV. ANALYSIS

Pursuant to the Court's October 25, 2018 Order, the only cause of action still at issue in this suit is Plaintiffs' claim for medical malpractice. Dkt. 40, at 35. To prove medical malpractice, a plaintiff must establish that: (1) the defendant owed a duty to plaintiff to conform to a certain standard of care; (2) the defendant breached that standard; (3) the defendant's breach caused an injury; and (4) the plaintiff sustained a legally recognized injury or damage. *Schmechel v. Dille*, 219 P.3d 1192, 1203 (Idaho 2009). Although filed last, the Court addresses Plaintiffs' Motion for Partial Summary Judgment first because it disposes of the need to further discuss the first two elements of Plaintiffs' medical malpractice claim.

### A. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 72)

Plaintiffs ask the Court to enter an order granting partial summary judgment finding: (1) that Dr. Mortimer owed them a duty as his patients; and (2) that he breached this duty

by violating the community standard of care during the course of his medical treatment of Plaintiffs. Dkt. 72, at 1. In response, Dr. Mortimer admits he had a duty to Plaintiffs and that he breached the applicable standard of care when he inseminated Ashby with his own semen.[6] Dkt. 74, at 3. The Court accordingly grants Plaintiffs' Motion for Summary Judgment. Plaintiffs have established Dr. Mortimer owed them a duty as his patients and that he breached this duty by violating the applicable standard of care during the course of his medical treatment.

### B. Dr. Mortimer's Motion for Summary Judgment (Dkt. 49)

Dr. Mortimer argues Plaintiffs cannot establish the third and fourth elements of a medical malpractice claim because they have not suffered a legally cognizable injury and have not been damaged. In support, Dr. Mortimer contends Plaintiffs' cannot establish a claim for "wrongful pregnancy" as a matter of law. Dr. Mortimer also argues Plaintiffs cannot prove their medical malpractice claim because they have failed to show any physical injury or damage, and Plaintiffs' emotional distress is speculative and not compensable. The Court addresses each argument in turn.

### 1. Wrongful Pregnancy

Dr. Mortimer first suggests Plaintiffs' claim can only be considered one for "wrongful pregnancy." Dkt. 49-1, at 4. An action for wrongful pregnancy "refers to those

---

[6] Although Dr. Mortimer objects to some of the language Plaintiffs use to describe his breach, and notes he does not agree that his conduct was reckless, Plaintiffs do not seek summary judgment finding Dr. Mortimer was reckless, and Dr. Mortimer's objection to Plaintiffs' characterization of his breach may be addressed with motions in limine.

cases where parents bring a claim on their own behalf for the monetary and emotional damages they suffered as a result of giving birth to a normal and healthy but unplanned and unwanted child." *C.S. v. Nielson*, 767 P.2d 504, 506 (Utah 1988). Such actions are usually based upon "a negligently performed or counseled sterilization procedure or abortion, or negligence in preparing or dispensing a contraceptive prescription." *Id*. (citations omitted).

Dr. Mortimer argues "[w]rongful pregnancy, or wrongful conception as it is occasionally termed, is simply shorthand for medical malpractice where the alleged negligence results in the conception and birth of a healthy, but unwanted child." Dkt. 49-1, at 4 (citing *Fulton-Dekalb Hosp. Auth. v. Graves*, 314 S.E.2d 653, 654 (Ga. 1984)) (differentiating wrongful pregnancy from the related claims of wrongful birth and wrongful life). Unlike the claims of wrongful life and wrongful birth, which neither the State of Idaho nor most jurisdictions recognize, wrongful pregnancy is an almost universally accepted cause of action. *Graves*, 314 S.E.2d at 654 ("[M]ost jurisdictions now allow an action by parents against the physician for wrongful pregnancy or wrongful conception.").

The Idaho Supreme Court has never directly addressed the issue of wrongful pregnancy, but has noted such a cause of action is valid in Idaho pursuant to Idaho Code section 5-334(2). *Conner v. Hodges*, 333 P.3d 130, 134 n. 2 (Idaho 2014). Idaho Code section 5-334(1) bars any claim for wrongful life, which means a claim that "but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted." *Id*. Idaho Code section 5-334(2) clarifies that section 5-334(1) does not preclude causes of action based on claims that, "but for a wrongful act or

omission, fertilization would not have occurred[.]"[7] *Id.*

Although seemingly rare, wrongful pregnancy claims have been brought, with varying success, in a variety of circumstances, including for failed sterilization procedures, *Simmons v. Hertzman*, 651 N.E.2d 13 (Ohio Ct. App. 1994), by parents of a child born with birth defects alleging that, due to negligent medical advice or testing, they were precluded from making an informed decision about whether to conceive, *Siemieniec v. Lutheran Gen. Hosp.*, 512 N.E. 2d 691 (Ill. 1987), against fertility centers for using a plaintiff's semen without consent, *Pressil v. Gibson*, 477 S.W.3d 402 (Tex. Ct. App. 2015), and against a lab for mistakenly using the wrong semen in an *in vitro* fertilization procedure, *Andrews v. Keltz*, 838 N.Y.S. 2d 363 (N.Y. 2007). However, regardless of the form of the negligent act causing a "wrongful pregnancy," the claim refers to parents' claims for damages as a result of "giving birth to an *unplanned and unwanted* child." *Nielson*, 767 P.2d at 506. (emphasis added). Dr. Mortimer contends Plaintiffs cannot establish a wrongful pregnancy claim as matter of law because it is undisputed that Rowlette was neither unplanned nor unwanted. Dkt. 49-1, at 11.

Further, when wrongful pregnancy claims are asserted, courts are divided as to what damages are actually compensable. The majority of jurisdictions have adopted what is known as the "limited-damage rule," finding that giving birth to a healthy child is not a

---

[7] Idaho Code section 5-334(2) also permits claims that, but for a wrongful act or omission, maternal death would not have occurred, or "disability, disease, defect or deficiency of an individual prior to birth would have been prevented, cured or ameliorated in a manner that preserved the health and life of the affected individual." I.C. § 5-334(2).

legal injury from which damages may be awarded. *See, e.g., Johnston v. Elkins*, 736 P.2d 935, 940 (Kan. 1987); *Rieck v. Med. Protective Co. of Fort Wayne, Ind.,* 219 N.W.2d 242, 244-45 (Wisc. 1974); *Nielson*, 767 P.2d at 509-10. Based on a variety of considerations, the limited-damage rule does not permit recovery of child-rearing costs. As the Utah Supreme Court explained in *Nielson*:

> Some of the courts adopting this rule have based their rationale upon the speculative nature of child-rearing damages. Others have expressed concern for the mental and emotional health of the child who may someday learn that he or she was not wanted and was reared by funds forcibly obtained from another person or business. Some courts have ruled that the injury of rearing the child is too remote from the negligence caused and allowing such recovery would place an unreasonable burden upon the defendant while offering a windfall to the parents, who may enjoy the benefits of parenthood at the defendant's expense. Such burden, these courts indicate, is out of proportion to the culpability involved and will have a rampant and incontinent effect. Additionally, it has been noted that allowing such damages would likely impinge upon the availability and costs of sterilization surgery while creating the possibility of new and protracted litigation and fraudulent claims. . . . Lastly, many courts have expressed the opinion that parents cannot be damaged by the birth and rearing of a normal, healthy child since the joy, companionship, and affection which such a child can provide are benefits that will inevitably outweigh the costs of rearing that child.

767 P.2d at 514 (internal citations omitted).

Under the majority, limited-damage rule, damages for wrongful pregnancy are limited to those related to the pregnancy itself, such as medical expenses arising from the pregnancy, lost wages during pregnancy, and the pain and suffering of the pregnancy and delivery. *Miller v. Johnson*, 343 S.E.2d 301, 305 (Va. 1986). Because Plaintiffs, by their own admission, do not seek the pecuniary losses associated with Ashby's pregnancy, Dr. Mortimer argues Plaintiffs cannot prove any compensable damages and that their claims should be dismissed as a matter of law.

Plaintiffs concede they do not complain that they conceived a healthy but unwanted or unplanned child. Plaintiffs highlight that they both desperately wanted, and went through extensive fertility treatments to conceive, Rowlette, and that they do not seek damages related to Ashby's pregnancy. Plaintiffs argue such facts illustrate that their claim is not one for wrongful pregnancy at all. Instead, Plaintiffs contend their claim is for medical negligence under Idaho law, and emphasize that Idaho law does not differentiate between medical negligence and medical negligence resulting in pregnancy.

Because their claim is not one for wrongful pregnancy, and because medical negligence cases resulting in pregnancy do not receive differing treatment under Idaho law, Plaintiffs contend the injury and damages in this case should be evaluated in the same manner as in any other negligence case. Plaintiffs suggest medical malpractice is simply a category of the tort of negligence, requiring the elements of a common law negligence action, with the exception that the standard of care and breach must be proven in accordance with Idaho code sections 6-1012 and 6-1013. Dkt. 63, at 4 (citing *Schmechel*, 219 P.3d at 1203; *Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct. App. 2009); I.C. § 6-1012; I.C. § 6-1013).

The Court agrees. As the United States District Court for the District of Vermont recently held in a similar case involving a physician accused of using his own semen to inseminate patients, this is not a case about parentage or conception; it is about fraud and deception by a physician. *Rousseau v. Coates*, 2019 WL 3220327, at *3 (D. Vermont 2019). In fact, with the advent of widespread consumer DNA testing, instances in which fertility doctors secretly used their own sperm for artificial insemination many years ago

have begun to surface with some regularity. Jacqueline Mroz, *Their Mothers Chose Donor Sperm. Their Doctors Used Their Own,* N.Y. Times, (August 21, 2019), http://www.nytimes.com/2019/08/21/health/sperm-donors-fraud-doctors.html. In response, some states have enacted laws that make a physician's use of his own semen to impregnate patients a felony and/or give victims the right to sue doctors for such conduct. *Id*.

For instance, Indiana recently enacted a "civil fertility fraud" statute. IN ST § 34-24-5-1 (2019). Indiana provides an extended statute of limitations for commencement of an action for civil fertility fraud, including allowing a cause of action, under certain circumstances, to commence no later than five years after the plaintiff "first discovers evidence sufficient to bring an action against the defendant through DNA . . . analysis." IN ST 34-11-2-15(b)(1) (2019). Although Idaho does not have a similar civil statute, the Court identifies the issue to illustrate that this case is not about "wrongful pregnancy," as Dr. Mortimer contends, but instead involves a developing area of law known as "insemination fraud." Jodi Lynee Madeira*, Uncommon Misconceptions: Holding Physicians Accountable for Insemination Fraud*, 37 LAW & INEQ. 45, 48 (2019).

Dr. Mortimer admits the present factual circumstance "on the surface appears to defy classification," Dkt. 49-1, at 7, but suggests this case is analogous to *Pressil*, 477 S.W. 3d at 405. In *Pressil*, plaintiff and his partner used condoms for birth control. On one occasion, plaintiff's partner secretly removed plaintiff's semen from a used condom and took it into a fertility center, where she falsely claimed to be plaintiff's wife and requested artificial insemination. The clinic obliged and she later gave birth to healthy twin boys.

Plaintiff brought a malpractice action against the fertility center for using his semen without his consent. The trial court dismissed plaintiff's case under Texas law. Plaintiff subsequently brought a legal malpractice suit against his attorneys. Several of his claims were dismissed on summary judgment. Plaintiff appealed, and the Court of Appeals affirmed, stating "[w]e conclude that the measure of damages available to plaintiffs in wrongful pregnancy cases is limited to the medical expenses associated with the failed procedure that produced the healthy but unwanted pregnancy." *Id*. at 410. Because plaintiff did not seek any damages associated with his partner's artificial insemination procedure, the Court of Appeals held the legal malpractice claim was properly dismissed because plaintiff could not have prevailed even if he had been represented by a reasonably competent lawyer.

Unlike Plaintiffs in this case, plaintiff in *Pressil* did not desire or plan for conception, and instead actively took steps to prevent it. *Pressil* presented a clear case of wrongful pregnancy because it involved an unwanted conception as a result of medical negligence (failure to obtain consent). Here, the conception was not unwanted or unplanned. Plaintiffs asked Dr. Mortimer to help them conceive with a mix of Fowler's and an anonymous donor's semen. What was unwanted and unplanned was Dr. Mortimer's use of his own semen to artificially inseminate Ashby without her knowledge or consent.

Dr. Mortimer also suggests this case is like the circumstances in *Andrews*, 838 N.Y.S. 2d at 365, where a husband and wife underwent an *in vitro* fertilization procedure in which the husband's sperm was supposed to be used to fertilize the wife's eggs. Dkt. 49-1, at 6. The lab mistakenly used donor sperm, resulting in the birth of a child who was not

the same race as, or biologically related to, the husband. When plaintiffs brought suit, the court considered their claim as one for wrongful conception. *Andrews*, 838 N.Y.S.2d at 366. To the extent plaintiffs claimed the lost opportunity to have a child with their own genetic makeup, the court characterized it as a claim for "wrongful nonbirth," or the loss of a child who could have been, but never was. *Id*. at 369. The court found such claim entirely speculative and unrecoverable. *Id*.

Although more factually similar to this case than *Pressil*, *Andrews* is also distinguishable. Unlike plaintiffs in *Andrews*, Plaintiffs here do not claim Rowlette's existence as an injury. *Id*. at 366. Dkt. 63, at 5. As Dr. Mortimer highlights, "Rowlette has brought Ashby and Fowler 37 years of joy and happiness. . . Plaintiffs wanted a child. . . love the child to this day, and experience great joy and satisfaction of having the child." Dkt. 49-1, at 11. It is clear Plaintiffs do not suggest Rowlette was unplanned or unwanted. Nor do Plaintiffs claim a lost opportunity to have a child of their own genetic makeup. Plaintiffs consented to the use of semen from an anonymous donor and were aware the procedure could result in the conception of a child who was not genetically related to Fowler. *See, e.g.*, Dkt. 49-5, Ex. B at 82:1-18. Plaintiffs do not complain that Rowlette is not biologically Fowler's child, but instead object to Dr. Mortimer's use of his own semen to inseminate Ashby. Moreover, while the lab in *Andrews* mistakenly used the wrong sperm, here Dr. Mortimer admits he intentionally used his own semen to artificially inseminate his patient.

*Pressil*, *Andrews*, and the other wrongful pregnancy cases Dr. Mortimer cites illustrate why Plaintiffs' case does not fall within the unique subset of medical negligence

claims classified as wrongful pregnancy or wrongful conception. Plaintiffs' injury is not premised on Ashby's pregnancy or Rowlette's existence; it instead arises from Dr. Mortimer's deceptive actions in providing medical care.

Moreover, the Idaho Supreme Court recognized a distinction between a medical malpractice claim and one for wrongful conception in *Conner v. Hodges*, 333 P.3d 130, n. 2 (2014). In *Conner*, the Idaho Supreme Court clarified that even where a plaintiff complains of injuries including caring for an unwanted child, where, as here, damages are based on a physician's violation of the applicable standard of care, the action is one for medical malpractice, not for wrongful conception:

> We note the complaint alleges damages based on Dr. Hodges' failure to provide care which conformed to the community standard of health care practice in the performance of bilateral tubal ligations. [Plaintiff] alleges she was damaged by needing to undergo a second tubal ligation, the pain and suffering due to the burden imposed by having an unhealthy and unwanted child, and her increased risk of needing additional medical care. As a result, we view this claim as one for medical malpractice, not one for wrongful conception under Idaho Code section 5-334(2).

*Id*. Similarly, Plaintiffs allege damages based on Dr. Mortimer's admitted failure to provide care which conformed to the community standard of health care practice in obstetrics and gynecology. Dkt. 74, at 3. The Court accordingly views Plaintiffs' claim as one for medical malpractice, not wrongful pregnancy. As a result, the limited-damage rule used in wrongful pregnancy cases is inapplicable and the Court considers Plaintiffs' damages in the context of a medical malpractice claim.

## 2. Medical Malpractice

### a. Physical Injury

Dr. Mortimer argues that even if Plaintiffs' claim is not for wrongful pregnancy, they have still failed to produce evidence to establish any legally cognizable injury because damage in a medical malpractice action must stem from a physical injury. Dr. Mortimer cites a number of out-of-state cases in support of his argument that "injury" in the context of medical malpractice means physical harm. Dkt. 49-1, at 14-15. The Idaho Supreme Court has not explicitly stated that physical injury is necessary to establish a *prima facie* case for medical malpractice. However, in *Conner*, the court implicitly found that the plaintiff suffered a legally cognizable injury as a result of an unsuccessful tubal ligation even though plaintiff "suffered no harm or pain" from the negligent performance of the procedure. 333 P.3d at 133. Plaintiff alleged she had experienced "substantial emotional distress, pain, suffering, loss of enjoyment of life," and that she was "at increased risk of needing additional expensive and painful medical care in the future." *Id*. at 137. The Idaho Supreme Court held "[r]egardless of the definition of 'injury' that we might choose to apply, it is manifest that this is an action for damages due to injury . . . on account of the provision of or failure to provide health care[.]" Although the *Conner* Court did not further discuss plaintiff's ability to recover for emotional trauma, it reversed summary judgment and allowed plaintiff's medical malpractice claim to proceed even though plaintiff did not allege a physical injury resulting from a negligently performed procedure.

While the Idaho Supreme Court has not addressed the issue directly, *Conner* suggests the Idaho Supreme Court would recognize that damage in a medical malpractice

action can stem from emotional injury. Dr. Mortimer does not dispute that he owed a duty of care to Plaintiffs arising from their physician-patient relationship. Dkt. 74. Nor does Dr. Mortimer dispute that he breached the applicable standard of care in treating Plaintiffs. Dkt. 74; Dkt. 53-4, Ex. B at 106:7-10. Rather, Dr. Mortimer implies that the scope of the duty he owed to Plaintiffs as his patients was limited to avoiding physically injuring them during his medical care; it did not extend to avoiding inflicting the emotional distress that could result from his surreptitious use of his own semen in providing such care. To accept Dr. Mortimer's argument would require the Court to ignore the reality of his conduct and insulate a physician from intentionally negligent, and—as discussed above, in some States criminal—"medical" treatment as long as it does not impose a physical injury. The Court cannot accept this proposition.

Dr. Mortimer notes there are carefully crafted exceptions to the general rule that a physical injury must be present to assert medical malpractice, such as in the context of a psychotherapist/patient relationship. Dr. Mortimer suggests that because the patients in such cases seek treatment specifically for mental well-being, it is foreseeable that the therapist may be liable under malpractice theories for purely emotional trauma. Dr. Mortimer implies Plaintiffs' emotional distress was not foreseeable because negligence in the obstetrics/gynecology field is not "especially likely" to cause emotional distress. Dkt. 49-1, at 15 (citing *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810-11 (D.C. Ct. App. 2011)).

"The concept of foreseeability is related to a court's determination of proximate, or legal, cause, as well as to its determination of duty." *Hedgepeth*, 22 A.3d at 794 n. 1. In

determining whether a physician had a duty to avoid emotional harm, courts have considered the nature of the relationship between the parties and the likelihood that emotional distress will result from particular medical treatment. *See, e.g., Taylor v. Baptist Med. Ctr., Inc.*, 400 So.2d 369, 374 (Ala. 1981) (holding patient was not precluded from recovering for her mental anguish caused by infant's death as a result of physician's failure to attend labor and delivery of child, even though no actual physical injury was claimed); *Chizmar v. Mackie*, 896 P.2d 196, 205 (Alaska 1995) (finding plaintiff's treating physician owed plaintiff a duty to refrain from activity which presented a foreseeable and unreasonable risk of causing emotional distress, and that a jury could reasonably conclude that the emotional distress resulting from physician's misdiagnosis of AIDS was foreseeable and that such distress was serious or severe); *Burgess v. Superior Court*, 831 P.2d 1197, 1201, 1206 (Cal. 1993) (noting that a cause of action to recover damages for emotional distress will lie "in cases where a duty arising from a preexisting relationship is negligently breached," and explaining that the "[f]oreseeability and certainty of [a] mother's [emotional] injury in labor and delivery cases" is a policy consideration that favors liability); *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990) (holding "liability for emotional injury should attach to the delivery of medical services."); *Curtis v. MRI Imaging Servs. II*, 956 P.2d 960, 963 (Oregon 1998) ("[W]hen the claim is that a medical practitioner breached a professional duty to guard against a specified medical harm, the fact that harm is psychological rather than physical is not a bar to liability.").

As the California Supreme Court explained in *Molien v. Kaiser Found. Hospitals*, 616 P.2d 813, 820 (Cal. 1980):

[The physical injury requirement] supposedly serves to satisfy the cynic that the claim of emotional distress is genuine. Yet we perceive two significant difficulties with the scheme. First, the classification is both overinclusive and underinclusive when viewed in the light of its purported purpose of screening false claims. It is overinclusive in permitting recovery for emotional distress when the suffering accompanies or results in any physical injury whatever, no matter how trivial. If physical injury, however slight, provides the ticket for admission to the courthouse, it is difficult for advocates of the "floodgates" premonition to deny that the doors are already wide open. . . . More significantly, the classification is underinclusive because it mechanically denies court access to claims that may well be valid and could be proved if the plaintiffs were permitted to go to trial.

The second defect in the requirement of physical injury is that it encourages extravagant pleading and distorted testimony. Thus it has been urged that the law should provide a remedy for serious invasions of emotional tranquility, 'otherwise the tendency would be for the victim to exaggerate symptoms of sick headaches, nausea, insomnia, etc., to make out a technical basis for bodily injury, upon which to predicate a parasitic recovery for the more grievous disturbance, the mental and emotional disturbance she endured.'

*Id*. (citations omitted). "Such concerns have prompted a growing number of jurisdictions to abandon the physical injury requirement all together." *Chizmar*, 896 P.2d at 202 (citations omitted).

Jody Madeira, an Indiana University Law Professor who tracks cases in the nascent field of fertility fraud, has succinctly explained a physician's duty to benefit the plaintiff through artificial insemination, and how that undertaking, by its nature, creates a foreseeable risk that the defendant's negligent breach of this duty will cause emotional distress:

[P]ysicians' inseminations of non-consenting (and unaware) patients represents a gross trespass under all standards of practice—including those in place decades ago. . . [W]hen a physician masturbates to produce a sample in one examination room, and then immediately uses that sample to inseminate a patient in another room, the boundaries are blurred between the

clinical procurement of a biological sample and the sexual touching associated with masturbation, orgasm, and ejaculation.

Insemination fraud introduces the gravest conflict of interest into the physician-patient relationship. The physician engaging in such acts exploits his patients' ignorance, trust, intense desire to conceive, and vulnerability. Essentially, the physician interposes himself in the marital relationship in lieu of a sperm donor who is supposed to resemble the intended parents. In committing illicit inseminations, physicians also breach other ethical obligations, including the duty to disclose all relevant medical information to patients and to deal honestly with them. In the deepest sense, they physicians breach the first tenet of the Hippocratic Oath: "first, do no harm."

Madeira, 37 Law & Ineq. at 52. Given Plaintiffs' vulnerability, the intimate nature of Dr. Mortimer's "donation," and the sacred aspect of both conception and the parent-child relationship, the Court finds a reasonable jury could conclude that Dr. Mortimer's breach presented a foreseeable and unreasonable risk of causing emotional distress. *Chizmar*, 896 at 205.

Further, Dr. Mortimer himself admitted that it was foreseeable his conduct could cause emotional distress. In his deposition, Dr. Mortimer stated he knew his actions were wrong at the time he took them. Dkt. 53-4, Ex. B at 45:2-13; 80:2-21. Dr. Mortimer also confirmed he could understand why his conduct caused Plaintiffs emotional distress. Dkt. 63-3, Ex. B. at 27:7-24. When questioned: "Do you understand that finding out that your trusted physician inseminated you with his own semen without your knowledge could cause emotional distress?" Dr. Mortimer responded: "Yes." *Id*. at 11-15. When asked: "Do you understand how being the husband of a person whose physician inseminated them with his own semen could cause distress?" Dr. Mortimer again responded: "Yes." *Id*. at 19. Dr. Mortimer also verified that he had no reason to dispute that his conduct caused both Ashby

and Fowler severe emotional distress. *Id*. at 28:7-14.

Despite such admissions, Dr. Mortimer's counsel contends Plaintiffs' emotional distress "would have been impossible for Dr. Mortimer to foresee at the time of the artificial insemination. The discovery was made 37 years later through the internet and through DNA matching, two technologies that were incomprehensible during the relevant time period." Dkt. 49-1, at 17. In making this argument, defense counsel suggests Dr. Mortimer could not foresee Plaintiffs would suffer emotional distress as a result of his conduct because he could not foresee such conduct would eventually be exposed. There is obviously a distinction between understanding your conduct is negligent and could cause a patient emotional distress and foreseeing you will be caught for taking such actions. While, by Dr. Mortimer's own admission, the former was foreseeable, the foreseeability of the latter is irrelevant.[8]

### b. Proximate Cause

In a medical malpractice case, a "plaintiff has the burden of proving not only that a defendant failed to use ordinary care, but also that the defendant's failure to use ordinary care was the proximate cause of damage to the plaintiff." *Pearson v. Parsons*, 757 P.2d 197, 202 (Idaho 1988) (internal citation and quotation marks omitted)). Proximate cause consists of actual cause and true proximate cause, which is also referred to as legal cause.

---

[8] Although defense counsel attempts to characterize the injury in this case as Plaintiffs' discovery of Dr. Mortimer's conduct, Plaintiffs suggest the real injury was Dr. Mortimer's conduct, which would have caused emotional distress in 1980, or any time thereafter, had Dr. Mortimer not concealed it. The relationship between this issue, proximate cause, and the statute of limitations for medical malpractice in Idaho is discussed below.

*Newberry v. Martens, M.D.*, 127 P.3d 187, 191 (Idaho 2005). In other words, proximate cause "is composed of two elements: cause in fact and scope of legal responsibility." *Doe v. Sisters of the Holy Cross*, 895 P.2d 1229, 1232 (Idaho Ct. App. 1995). Cause in fact, or actual cause, "is the factual question of whether a particular event produced a particular consequence." *Newberry*, 127 P.3d at 191. Legal cause exists "when it is reasonably foreseeable that such harm would flow from the negligent conduct." *Coombs v. Curnow*, 219 P.3d 453, 464 (Idaho 2009) (quoting *Cramer v. Slater*, 204 P.3d 508, 515 (Idaho 2009)).

Dr. Mortimer appears to contest Plaintiffs' ability to establish either actual or legal cause. In addition to his above-described arguments that he did not have a duty to avoid emotional harm to Plaintiffs because medical malpractice requires a physical injury and because Plaintiffs' emotional harm was not foreseeable, Dr. Mortimer argues Plaintiffs cannot establish proximate cause as a matter of law because they "have not produced any expert witness who will opine that Dr. Mortimer was required to avoid mental and/or emotional distress to the Plaintiffs." Dkt. 49-1, at 17. Despite Idaho's stringent requirement for expert testimony regarding duty and breach in medical malpractice cases, there is no requirement that proximate cause must also be shown through expert testimony. As the Idaho Supreme Court explained in *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 25 P.3d 88, 98 (Idaho 2001):

> There is no dispute that in a suit alleging medical malpractice, the plaintiff must prove both that the defendant breached a duty and that this breach proximately caused plaintiff's injuries. *See Conrad v. St. Clair*, 599 P.2d 292, 295 (Idaho 1979). Idaho Code §§ 6–1012 and 6–1013 require the applicable standard of care, and the failure to meet such standard in medical malpractice

cases, *must* be established by direct expert testimony. . . . However, this statutory language and precedent only address proof of standard of care, and breach of the standard of care in medical malpractice cases. The issue presented by St. Luke's is whether direct expert testimony is also required to show proximate cause. Unlike the elements of duty and breach of duty, there is no statutory requirement explicitly stating proximate cause in medical malpractice cases must be shown by direct expert testimony. Therefore, testimony admissible to show proximate cause in a medical malpractice case, like any other case, is governed by the rules of evidence regarding opinion testimony by lay witnesses and experts under Idaho Rules of Evidence 701 and 702.[9]

*Id*. (emphasis in original). As explained above, a reasonable jury could determine it was foreseeable that Dr. Mortimer's conduct could cause significant emotional distress.

Further, actual cause can be shown from a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *Formont v. Kircher*, 420 P.2d 661, 667 (Idaho 1965) (citation omitted). In *Formont*, the plaintiff had an infection in his leg that went untreated and eventually required amputation. The trial court made specific findings that defendant breached the requisite standard of care, and that there was evidence that proper care could have been expected to produce different results. However, the trial court also concluded there was not enough proof of proximate cause. The question on appeal was whether the trial court erred in finding the care, or lack of care, by the defendant-physician, was not established to be the proximate cause of the

---

[9] The Idaho Supreme Court later addressed its holding in *Sheridan* and clarified expert testimony may be required to establish proximate cause under the specific circumstances of a case, such as when a jury, comprised of lay people, is simply not qualified to determine the issue without the assistance of scientific expert testimony. *Swallow v. Emergency Med. of Idaho, P.A.*, 67 P.3d 68, 75 (Idaho 2003). Such testimony is not required here because a lay person is capable of determining, without aid of scientific testimony, whether or not it was foreseeable that Plaintiffs would suffer emotional distress upon learning their physician used his own semen in their artificial insemination procedure.

loss of the plaintiff's leg. The Idaho Supreme Court reversed the trial court's ruling on proximate cause, noting plaintiff was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. *Id*. (quoting *Helland v. Bridenstine*, 104 P. 626 (Wash. 1909)). Indeed, if it were necessary to demonstrate "conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science." *Id*. (internal citations and quotation marks omitted).

Ultimately, the question of proximate cause in an action for medical malpractice will almost always involve questions of fact for the jury to decide. *Cramer v. Slater*, 204 P.3d 508, 515 (Idaho 2009) (citing *Sisters of the Holy Cross*, 95 P.2d at 1264). Here, the evidence in the record presents a chain of circumstances from which proximate cause can be reasonably and naturally inferred. Plaintiffs have testified they suffered severe emotional distress when they learned of Dr. Mortimer's conduct, and that such distress has manifested physical symptoms including nausea, sleeplessness, depression, high blood pressure, and acid indigestion. Dkt. 63-1, at 3. Although, as discussed below, Dr. Mortimer argues Plaintiffs' distress was caused by factors other than Dr. Mortimer's conduct, proximate cause "in medical malpractice cases involving more than one possible cause of injury will be established if it is shown that the defendant's conduct was a substantial factor in bringing about the injury suffered by the plaintiff." *Easterling v. Kendall,* 367 P.3d 1214, 1225 (Idaho 2016) (quoting *Coombs*, 219 P.3d at 463). There is also no dispute that Dr. Mortimer breached the standard of care. Plaintiffs' expert suggests Dr. Mortimer deviated from the community standard of care in multiple respects. Dkt. 63-4, Ex. B. From this

record, a reasonable jury could find that Dr. Mortimer's conduct proximately caused Plaintiffs' emotional distress. Summary judgment on causation is, accordingly, denied.

### c. Damages

Dr. Mortimer also argues summary judgment is appropriate because Plaintiffs' damages are entirely speculative and are not recoverable. In support, Dr. Mortimer suggests a substantial portion of Plaintiffs' distress does not arise from their discovery of Rowlette's paternity, but rather from Rowlette's discovery that she was not Fowler's biological daughter. Dkt. 49-1, at 16. Ashby admitted in her deposition that even after they learned that Dr. Mortimer was likely Rowlette's biological father, she and Fowler attempted to conceal both this likelihood and the fact that they had used artificial insemination at all from Rowlette because they feared such information would "destroy her." Dkt. 49-4, Ex. A at 84:13-21. Fowler testified that when he learned Dr. Mortimer was likely Rowlette's father, he still wanted to conceal the information, "because it would be devastating to her." Dkt. 49-5, Ex. B at 76:5-11. When asked why the information would be devasting, Fowler explained: "She had lost essentially half of her identity at this point, because if I wasn't her biological father, then things that she thought were true were no longer true. So I thought it would be very hurtful." *Id*. at 76:17-21. Such statements illustrate at least part of Plaintiffs' emotional distress was caused by Rowlette's discovery that Fowler was not her biological father, and not by Plaintiffs' discovery that Dr. Mortimer was.

However, Fowler also explained that he was outraged to learn that Dr. Mortimer "had just disregarded entirely what we had agreed upon, that he would use his own semen to impregnate my wife . . . and now [Rowlette] is actually his biological daughter—just

really made me mad." *Id.* at 74:19-25.[10] Ashby also testified in her deposition that the knowledge of Dr. Mortimer's conduct left her nauseas and feeling as if she had been raped. Dkt. 63-5, Ex. C at 83:1-5. Ashby said she felt incredibly violated when she realized she had taken Rowlette with her to every prenatal appointment she had with Dr. Mortimer while pregnant with her son, when Dr. Mortimer had known at each visit that Rowlette was his daughter. *Id.* at 90:13-22. Ashby has repeatedly seen a counselor for her feelings of "[d]epression, rage, anger, not being able to get out of the bed in the morning, [and] lack of confidence" following her discovery of Dr. Mortimer's conduct. *Id.* at 92:18-25; 93:1-2. Fowler testified that Dr. Mortimer's actions are always "in the forefront" of his mind, Dkt. 63-7, Ex. E at 118:4-12, and that he suffers high blood pressure, acid indigestion, inability to sleep, and significantly increased nicotine use as a result. *Id.* at 14:8-11.

Plaintiffs' physical manifestations of emotional distress can be verified through objective medical tests. In the context of claims for negligent infliction of emotional distress, the Idaho Supreme Court has held conditions including loss of sleep, depression, headaches, and stomach pains are sufficient to prove a physical injury in order to recover for emotional distress arising out of a defendant's negligent conduct. *See, e.g., Brown v. Matthews Mortuary, Inc.*, 801 P.2d 37, 44 (Idaho 1990); *Czaplicki v. Gooding Joint School*

---

[10] When asked to describe how Dr. Mortimer broke his agreement with Plaintiffs, Fowler explained that Dr. Mortimer didn't meet the donor criteria they had agreed upon, and also wasn't "anonymous" in that Plaintiffs and Dr. Mortimer had agreed the donor wouldn't know Plaintiffs' identity or their baby, while Dr. Mortimer certainly knew Plaintiffs and subsequently knew Rowlette. Dkt. 49-5, Ex. B at 75:9-20.

*Dist.* 231, 775 P.2d 640, 646 (Idaho 1989).

The aforementioned facts illustrate there is a genuine dispute of material fact as to whether Plaintiffs' emotional distress was caused by Rowlette's discovery that she is not Fowler's daughter, or by Dr. Mortimer's conduct. Upon hearing Plaintiffs' testimony, a reasonable jury could determine either or both of these scenarios is accurate.[11] A jury could also find a specific dollar amount too difficult to calculate and award nominal damages to signify the violation Plaintiffs suffered. *Harwood v. Talbert*, 39 P.3d 612, 619 (Idaho 2001) ("Generally, nominal damages are awarded for the infraction of a legal right to demonstrate, symbolically, that the plaintiff's person or property has been violated."). Summary judgment is not appropriate under such circumstances.

Dr. Mortimer also contends the "stressors" Plaintiffs now suffer are largely caused by this litigation, and not by Dr. Mortimer's conduct. Dkt. 49-1, at 16. In support, Dr. Mortimer cites counseling notes that purportedly suggest Ashby's chief complaints center on her divorce from her current husband and her feelings of empathy for Rowlette and Fowler. *Id.* Yet, the counseling notes submitted to the Court are for one day of Ashby's treatment. Dkt. 49-11, Ex. H. Plaintiffs clearly have the burden of proving their damages at trial. *Easterling*, 367 P.3d at 1226. On summary judgment, Dr. Mortimer has the burden of showing Plaintiffs cannot establish their damages as a matter of law. The notes from Ashby's first day of counseling in 2018—particularly when coupled with Plaintiffs'

---

[11] Dr. Mortimer's arguments regarding proximate cause, damages, and the statute of limitations for medical malpractice claims are interrelated. The Court separates them into different sections for organizational purposes.

testimony regarding the significant emotional distress and physical manifestation of emotional distress that they have suffered as a result of Dr. Mortimer's conduct—do not satisfy Dr. Mortimer's burden.

### d. Statute of Limitations

Finally, Dr. Mortimer implies Plaintiffs' medical malpractice claim should not survive summary judgment because the statute of limitations did not accrue when Plaintiffs discovered Dr. Mortimer's conduct, but instead accrued at the time of the artificial insemination. Dkt. 49-1, at 17-19. In support of this argument, Dr. Mortimer first suggests allowing Plaintiffs to recover for emotional distress would produce inconsistent and unfair results under *Glaze v. Deffenbaugh*, 172 P.3d 1104, 1108 (Idaho 2007). In *Glaze*, two sisters brought battery claims against their father for offensive sexual acts that occurred 25 years prior to their filing suit. The sisters argued the statute of limitations should be tolled because of their father's efforts to conceal his molestation from each of them. The Idaho Supreme Court affirmed the trial court's dismissal of plaintiffs' claims on summary judgment because the two-year statute of limitations for actions seeking compensation for battery had run. *Id.* at 1107. Dr. Mortimer suggests permitting Plaintiffs to move forward with a medical malpractice claim that seeks "only emotional damages would allow the Plaintiffs a recovery the plaintiffs in *Glaze* were denied because of the statute of limitations rules in malpractice actions." Dkt. 49-1 at 17 n. 7.

The Court disagrees. A cause of action for battery, as the sisters alleged in *Glaze*, accrues when the wrongdoing occurs, not when it is discovered. I.C. § 5-219(5). By contrast, the Idaho Supreme Court has held that there must be "some damage" before a

medical malpractice cause of action begins to accrue. *Lapham v. Stewart*, 51 P.3d 396, 400 (Idaho 2002). This is because "[t]he gist of a malpractice action is negligence." *Umphrey v. Sprinkel*, 682 P.2d 1247, 1253 (Idaho 1983). "It is axiomatic that in order to recover under a theory of negligence, the plaintiff must prove actual damage. As a general rule the statute of limitations does not begin to run against a negligence action until some damage has occurred." *Blake v. Cruz*, 698 P.2d 315, 322 (Idaho 1984) (*superseded in part by statute*, I.C. § 5-334). In *Stuard v. Jorgenson*, 249 P.3d 1156, 1160 (Idaho 2011), the Idaho Supreme Court clarified that while the legislature has expressly rejected a discovery rule, "some damage" means the existence of "some damage" must be "objectively ascertainable" before a medical malpractice claim begins to accrue. *Id*. at 1161. An injury is objectively ascertainable when "objective medical proof would support the existence of an actual injury." *Id*. at 1160 (internal quotation marks and citation omitted). It is not inconsistent to allow Plaintiffs to recover for an entirely different cause of action, with a different statute of limitations, than that at issue in *Glaze*.

Ultimately, the issues of proximate cause, Plaintiffs' damages, and the statute of limitations all appear to depend on how Plaintiffs' injury is characterized. Dr. Mortimer suggests Plaintiffs' injury is the mental anguish arising from their discovery of his malpractice and not the malpractice itself. Analogizing this case to *Doe 56 v. Mayo Clinic Health System--Eau Claire Clinic, Inc*., 880 N.W.2d 681 (Wis. 2016), Dr. Mortimer argues a "fortuitous event or sheer luck in discovering malpractice, and the trauma from the discovery, cannot be the claimed damage." Dkt. 49-1, at 19.

In *Mayo*, the plaintiff was a young boy who brought an action against a physician

for molesting him during a routine examination. During the examination, the defendant touched and examined plaintiff's penis. Plaintiff assumed the touching was merely a routine part of the examination. Several years later, plaintiff and his family watched a news segment which reported the physician was the subject of criminal charges for sexual molestation of young boys. Upon viewing the report, plaintiff first realized he had been molested, and subsequently brought a malpractice action. The *Mayo* court dismissed the case because the statute of limitations had run. In so holding, the court explained the boy's injury was his molestation, whether he appreciated the event or not, and not his discovery of the molestation years later.

While the Court recognizes the parallel between this case and *Mayo*, the statute of limitations for medical malpractice in Wisconsin accrues when a patient suffers a "physical injurious change," 880 N.W.2d at 685, and not, as in Idaho, when "some damage" is "objectively ascertainable." *Stuard*, 249 P.3d at 1160. Further, plaintiff in *Mayo* knew his penis had been touched and examined, but not that such examination was medically inappropriate. Here Plaintiffs had no knowledge—or any reason to suspect—that Dr. Mortimer had used his own semen to inseminate Ashby. While Ashby knew she had been "touched" to the extent necessary for her artificial insemination, she had no way of discovering that, in performing the procedure, Dr. Mortimer was perpetrating a fraud and breach of duty.

In sum, this case, and particularly the injury and damages associated with Plaintiffs' claim, presents difficult questions and issues of first impression not only in Idaho, but nationwide. Ultimately, due to genuine issues of material facts regarding causation and

damages, Plaintiffs' claim is appropriately left to a jury to decide. Dr. Mortimer's Motion for Summary Judgment is accordingly denied.

### 3. OGA's Motion for Summary Judgment (Dkt. 50)

OGA suggests it is entitled to summary judgment because *respondeat superior* is not applicable and because Plaintiffs cannot prove all of the elements of their claim for negligent supervision. Plaintiffs did not address OGA's arguments regarding negligent supervision in their response brief and conceded during oral argument that they are no longer pursuing a claim for negligent supervision. The Court accordingly considers whether OGA can be held liable under *respondeat superior*. If it cannot, OGA must be dismissed as a defendant in this suit.

### a. *Respondeat superior*

Plaintiffs allege that OGA is liable for Dr. Mortimer's acts under the doctrine of *respondeat superior*, which states a "master, or employer, is responsible for the torts of his servant, or employee, when they are committed within the scope of the servant's employment." *Smith v. Thomson*, 655 P.2d 116, 118 (Id. Ct. App. 1982) (citing *Scrivner v. Boise Payette Lumber Co*., 268 P.19 (Idaho 1928)). The scope of one's employment encompasses:

> those acts which are so closely connected with what the servant is supposed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objective of employment.
>
> . . . [I]n general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master.

> An employee's purpose or intent, however misguided in its means, must be to further the employer's business interests. If the employee acts from purely personal motives . . . in no way connected with the employer's interest. . . then the master is not liable.

*Podolan v. Idaho Legal Aid Services, Inc*., 854 P.2d 280, 288 (Id. Ct. App. 1993) (quoting

*Birkner v. Salt Lake County*, 771 P.2d 1053, 1056 (Utah 1989)).

OGA argues Dr. Mortimer was acting with purely personal motives, and was in no way acting in OGA's interest, when he inseminated Ashby with his own semen. Dkt. 51, at 5. In support, OGA cites deposition testimony from Dr. Mortimer stating he decided to use his own semen because he was "concerned about patients that were infertile" and wanted to help his patients conceive. *Id*. at 5-6. OGA suggests Dr. Mortimer kept his conduct secret from OGA because he understood such conduct would "be damaging to OGA instead of furthering its interests." *Id*. at 7. Plaintiffs counter that facilitating pregnancies furthered OGA's interests in producing successful pregnancies for OGA's patients and securing the need for OGA's prenatal care and delivery services. Dkt. 64, at 5-6.

Generally, the issue of "whether an employee acted within the scope of employment is a factual question to be decided by the trier of fact." *Podolan*, 854 P.2d at 288. Here, it appears there are disputed material facts which preclude summary judgment on whether Dr. Mortimer was acting, at least in part, with the purpose of serving OGA. However, despite such dispute, "[s]ome conduct . . . is so clearly outside the scope of employment that the issue may properly be decided by the trial judge as a matter of law." *Birkner*, 771 P.2d at 1057; *Podolan*, 854 P.2d at 288. For instance, if an employee's conduct is

"unprovoked, highly unusual, and quite outrageous," then an employer is not liable. *Birkner*, 771 P.2d at 1057 (citing W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 70 at 56) (5th ed. 1984)); *see also Kruse v. White Bros.*, 253 P. 178, 181 (Cal. App. Ct. 1927) (explaining an employee's substantial deviation from the course of his duty may release an employer from liability, and noting "[i]n some cases the deviation may be so marked, and in others so slight relatively, that the court can say that no conclusion other than that the act was or was not a departure could reasonably be so supported").

Here, the Court finds Dr. Mortimer's conduct represented an extreme deviation from, and cannot be considered fairly or reasonably incidental to, his duties as an OB/GYN. Dr. Mortimer's conduct can clearly be considered "highly unusual, unprovoked, and quite outrageous." *Birkner*, 771 P.2d at 1057. Dr. Mortimer has admitted he knew his conduct was wrong at the time he inseminated Ashby but that he justified it to make himself feel better, that he intentionally hid such conduct from OGA and did not want his colleagues to know about it, that he breached both his duty to Plaintiffs and the applicable standard of care, and that he stopped using his own semen to inseminate his patients when DNA testing became more widespread because he feared that his conduct would be discovered. Further, Plaintiffs' expert describes Dr. Mortimer's actions as intentionally negligent, purposefully deceptive, and a knowing deviation from the applicable standard of care. Dkt. 63-4, Ex. B at 2-3. There is no expert testimony in the record to counter this characterization. The Court cannot find Dr. Mortimer's actions were "fairly" and/or "reasonably incidental," to his employment duties in light of this evidence. *Podolan*, 854 P.2d at 288. OGA's Motion for Summary Judgment is accordingly granted and OGA is dismissed as a defendant.

### 4. Plaintiffs' Motion to Amend (Dkt. 53)

Plaintiffs seek to amend their Complaint to include a prayer for punitive damages. Plaintiffs suggest the punitive damages analysis in this case is subject to the common law in effect prior to the enactment of Idaho Code section 6-1604. Prior to 1987, punitive damages were appropriate where defendant's actions constituted "an extreme deviation from reasonable standards of conduct," and were performed "with an understanding of or a disregard for its likely consequences (in the words of prior cases, with fraud, malice or oppression)[.]" *Linscott v. Rainier Nat'l Life Ins. Co*., 606 P.2d 958, 962 (Idaho 1980) (compiling cases). Because Dr. Mortimer's conduct occurred in 1980, Plaintiffs argue the punitive damages analysis should be under the common law then in effect, and that their motion to amend is accordingly governed by Rule 15 of the Federal Rules of Civil Procedure. Dkt. 53-1, at 5-6.

Idaho Code section 6-1604 became effective on July 1, 1987. Under this statute, a party is prohibited from pleading punitive damages without leave of court. If the plaintiff seeks leave to amend to add a prayer for punitive damages:

> The court shall allow the motion to amend the pleadings if, after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.

I.C. § 6-1604(2).

The standard for an actual punitive damages award is found in Idaho Code section 6-1604(1), which requires that a claimant must prove by "clear and convincing evidence" that the defendant's conduct was "oppressive, fraudulent, wanton, malicious, or

outrageous[.]" *Id*. Dr. Mortimer argues Idaho Code section 6-6104 governs this matter because the Idaho Supreme Court has plainly stated that the determination of whether the statute applies is determined by when the "**cause of action accrues**." Dkt. 61, at 6 (emphasis in original) (citing *Mac Tools v. Griffin*, 879 P.2d 1126, 1131 (Idaho 1994)).

The Court finds Idaho Code section 6-6104 is applicable.[12] Idaho Code section 6-1604(2) is "substantive in nature, and therefore controlling in federal court in a diversity case." *Windsor v. Guarantee Trust Life Ins. Co*., 684 F. Supp. 630, 633 (D. Idaho 1988) (citations omitted). In *Mac Tools*, the Idaho Supreme Court cited legislative history stating Idaho Code section 6-6104 will apply to "causes of action which accrue on and after July 1, 1987." 879 P.2d at 1131 (citing Section 18 of Idaho S.L. 1987, ch. 278). As Dr. Mortimer notes, if Plaintiffs' medical malpractice claim accrued in 1980, or any time before Idaho code section 6-6104 was enacted in 1987, their claim would be time-barred. Because the Court has held Plaintiffs' medical malpractice claim accrued when Dr. Mortimer published his DNA on Ancestry.com, Plaintiffs' claim accrued long after Idaho code section 6-6104 became the applicable standard for punitive damages.[13]

The decision whether to allow a plaintiff to amend a complaint to allege punitive damages rests within the Court's discretion. *Vendelin v. Costco Wholesale Corp*., 95 P.3d 34, 41 (Idaho 2004); *Hoglan v. First Sec. Bank of Idaho, N.A*., 819 P.2d 100, 105 (Idaho 1991). "Whether punitive damages may be awarded depends on 'whether the plaintiff is

---

[12] The Court held a hearing on the punitive damages issue on September 23, 2019, at which time the four other motions addressed in this decision were also heard.

[13] Dr. Mortimer first published his DNA results on Ancestry.com sometime in 2016. Dkt. 61, at 5.

able to establish the requisite intersection of two factors: a bad act and a bad state of mind.'" *Hall v. Farmers All. Mut. Ins. Co.*, 179 P.3d 276, 282 (Idaho 2007) (quoting *Myers v. Workmen's Auto Ins., Co.*, 95 P.3d 977, 985 (Idaho 2004)). Further, "the primary purpose behind an award of punitive damages is to deter similar conduct from happening in the future." *Vendelin*, 95 P.3d at 49 (quoting *Walston v. Monumental Life Ins. Co.*, 923 P.2d 456, 465 (Idaho 1996)).

Here there is substantial evidence to support submitting the issue of punitive damages to the jury. Plaintiffs have submitted the expert report of Dr. Parsons, who concluded Dr. Mortimer's conduct deviated from the local standard of care for obstetrician/gynecologists in the Idaho Falls, Idaho area during the years 1979 to 1981 in eight respects. Dkt. 63-4, Ex. B at 2-4. Dr. Parsons further concluded, with reasonable medical certainty, that Dr. Mortimer breached the standard of care by "knowingly and purposefully using his own semen to artificially inseminate Ms. Ashby without her or Mr. Fowler's knowledge or consent in order to obtain a conception with his own biologic child." *Id*. at 4.

Dr. Mortimer has not offered his own expert to counter this evidence and chose not to depose Dr. Parsons. Instead, Dr. Mortimer notes a plaintiff must first be entitled to some other legal or equitable relief before punitive damages are available, and contends punitive damages are prohibited because Plaintiffs have not suffered any actual damage. Dkt. 61, at 7 (citations omitted). However, the Court has already determined Plaintiffs have submitted sufficient evidence that they have suffered compensable damages to survive summary judgment on the damage element of their medical malpractice claim.

Further, in Idaho, "nominal damages may support a punitive award. The foundational requirement is merely that some legally protected interest be invaded." *Harwood v. Talbert*, 39 P.3d 612, 619 (Idaho 2001) (quoting *Crosby v. Rowand Mach. Co*., 729 P.2d 414, 419 (Id. Ct. App. 1986)). Even if a jury finds compensatory damages are unwarranted, the jury could clearly find Ashby's right to bodily integrity and Plaintiffs' rights to informed consent were violated by Dr. Mortimer's conduct. As the Supreme Court has held, "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint and interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

Dr. Mortimer next argues his actions cannot be considered "an extreme deviation from reasonable standards of conduct," because Dr. Parson's "primary critique" is that "Dr. Mortimer's actions prevented anonymity between the donor and Plaintiffs." Dkt. 61, at 9. Dr. Mortimer suggests he never interfered with the anonymity requirement because he "never interfered with Plaintiffs' lives, or Rowlette's, in any way." *Id*. This argument ignores the fact that Dr. Mortimer significantly interfered with Plaintiffs' and Rowlette's lives when he unilaterally decided Plaintiffs were better off having his baby than risking another month of infertility. The argument also fails to recognize that Dr. Mortimer continued to treat Ashby for her subsequent pregnancy after Rowlette was born, and thus violated Plaintiffs' desire that their sperm donor would not know them or their baby. Finally, the argument ignores Dr. Parsons' conclusion that Dr. Mortimer deviated from the applicable standard of care in seven additional respects when he inseminated Ashby with

his own semen. Dkt. 63-4, Ex. B at 2-3. The Court finds a reasonable jury could conclude such significant deviation from the applicable standard of care was "extreme."

Even if his conduct could be considered an extreme deviation from reasonable standards of conduct, Dr. Mortimer notes Plaintiffs must also establish that he acted maliciously and that he was aware of the likely consequences of his actions.[14] Dkt. 61, at 10-11 (citing *Seiniger Law Offices P.A. v. North Pac. Ins. Co*., 178 P.3d 241 (2007)). Dr. Mortimer suggests Plaintiffs cannot make such a showing because "the evidence in the record indicates Dr. Mortimer's intentions were to do good." *Id*. at 11. In support, Dr. Mortimer notes donor semen was often in limited supply and had a short "shelf-life" at the time of Ashby's insemination, and that, as a result, he used his own semen "for the singular purpose" to help his patients "on a few rare occasions." *Id*. at 6, 11. Dr. Mortimer suggests, "Plaintiffs would be hard-pressed to find any case in which punitive damages were awarded when the defendant's actions were intended to do good, regardless of how misguided the accompanying actions may have been." *Id*. at 12. There are several problems with this argument.

First, while it could be that Dr. Mortimer's motivation was entirely charitable, his characterization of his motivation is self-serving. Moreover, Dr. Mortimer has also

---

[14] Dr. Mortimer also suggests he couldn't be aware of the likely consequences of his actions because Plaintiffs' discovery of his conduct "could not have been comprehended in 1980." Dkt. 61, at 12. The Court has already addressed the distinction between knowing your actions are wrong and could cause damage at the time you take them—both of which Dr. Mortimer has admitted—and understanding such conduct will be discovered. Dr. Mortimer's belief that his use of his own semen to inseminate patients could not be detected doesn't change his admitted understanding that his conduct was wrong and could cause Plaintiffs' significant emotional distress.

admitted that he knew his actions were wrong at the time he took them, but that he justified such conduct to make himself feel better. Dkt. 53-4, Ex. B at 80:2-21. In light of such conflicting evidence from Dr. Mortimer himself, Plaintiffs are entitled to an opportunity to have a jury decide which of Dr. Mortimer's statements is genuine.

Second, and relatedly, Dr. Mortimer has changed his story throughout this suit. For instance, he initially denied inseminating Ashby with his own semen in his Answer to Plaintiffs' Complaint (Dkt. 13), and again denied that he inseminated Ashby with his own semen in his Response to Plaintiffs' First Set of Requests for Admission (Dkt. 45-2, Ex. B at 8, Response No. 16). Dr. Mortimer then amended his Response to Plaintiffs' First Requests for Admission to state:

> Dr. Mortimer does not have specific recall about inseminating Ms. Ashby, or any other particular patient, with his own sperm. Dr. Mortimer recalls generally, however, that on occasion he would donate his own sperm when no other sperm donors were available to inseminate his patients who presented to his office and were ovulating and the patients had requested an anonymous donor.

Dkt. 45-2, Ex. C at 1, Amended Response No. 16.

During his subsequent deposition, Dr. Mortimer admitted he inseminated Ashby with his own semen and that he knew Rowlette was his biological child the day she was born. Dkt. 45-2, Ex. D at 43:13-15. Despite this admission, Dr. Mortimer refused to take a paternity test to confirm his paternity. When ordered to submit to a paternity test by this Court (Dkt. 44), Dr. Mortimer filed a Motion for Reconsideration (Dkt. 45) in what can be viewed as a last-ditch effort to avoid having his paternity conclusively established for purposes of this case. Dr. Mortimer's dishonesty during discovery and significant efforts

to avoid liability by evading Plaintiffs' attempts to establish paternity suggest his motivations were not as pure as he contends.

Third, and finally, even if Dr. Mortimer only had good intentions, legal scholars have pointed out the harm arguments like Dr. Mortimer's—that he only used his own semen to help patients who desperately wanted to conceive—can cause:

> It is particularly despicable when such unscrupulous physicians—like other predators—use patients' 'desperation' as an excuse for illicit inseminations . . . . These are the same defenses that misogynists proffer to justify sexual harassment ('She needed the attention!' "She was asking for it!'), or when abusers blame victims and present themselves as the injured parties. These assertions hijack vulnerability and commonly reinjure those who are already suffering . . . . When we assume that someone who 'desperately' wants children would do *anything* to conceive, we tend to doubt and devalue their agency. We regard them as paralyzed or pathological broken souls who can be healed only by a baby.

Madeira, 37 LAW & INEQ. at 54 (emphasis in original). Although clearly not precedent, Madeira's analysis illustrates that a reasonable jury could similarly conclude Dr. Mortimer acted with the requisite "harmful state of mind" when fathering Plaintiffs' child without their knowledge or consent.

In sum, the Court finds that Plaintiffs have established a "reasonable likelihood" of proving facts at trial sufficient to support a punitive damages award. I.C. § 6-1604(2). Plaintiffs' expert is prepared to testify that Dr. Mortimer's conduct constituted an intentional deviation from the applicable standard of care. Dr. Mortimer has not offered any conflicting evidence, and, in light of his conduct during this suit, his proffered justification for his actions is suspect, even if relevant in light of the severity of his deception. Further, Dr. Mortimer's admission that he knew his actions were wrong at the

time he took them demonstrates a reasonable likelihood of proving at least a disregard for likely consequences. The motion to amend for punitive damages is, therefore, granted.[15]

### 5. Dr. Mortimer's Motion to Strike (Dkt. 66)

Finally, Dr. Mortimer moves to strike the Declaration of Plaintiffs' expert, Dr. Parsons Dkt. 65-1 (hereinafter "Declaration"), filed with Plaintiffs' Reply in support of their Motion to Amend to Include a Prayer for Punitive Damages (Dkt. 65). Dr. Mortimer argues the Declaration is improper because it offers new, previously undisclosed, opinions in violation of Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiffs respond that the Declaration merely explains and clarifies Dr. Parsons' conclusions in response to the purported mischaracterization of Dr. Parsons' expert opinion contained in Dr. Mortimer's Response to Plaintiffs' Motion to Amend.

Under the Federal Rules of Civil Procedure, an expert witness disclosure must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them"; "the facts or data considered by the witness in forming them"; any exhibits that will be used to summarize or support them; and "the witness's qualifications[.]" Fed. R. Civ. P. 26(a)(2)(B). Expert disclosures must be made at the time and in the sequence ordered by the Court. Fed. R. Civ. P. 26(a)(2)(D). A party is permitted to supplement or correct a disclosure "if the party learns that in some material respect the

---

[15] The proposed Amended Complaint submitted by Plaintiffs includes their now-dismissed claims against OGA. Dkt. 53-3. The Court accepts the proposed Amended Complaint but strikes all allegations regarding OGA. Similarly, although the Court accepts the proposed Amended Complaint, all of the causes of action detailed therein, with the exception of Plaintiffs' claim for medical malpractice, have been dismissed and will not be considered at trial. Dkt. 40.

disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

Supplementation under Rule 26(e) "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998). Rule 26(e) does not "give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 639 (D. Haw. 2008) (internal citation and quotation marks omitted). "To countenance a dramatic, pointed variation of an expert's disclosure under the guise of Rule 26(e)(1) supplementation would be to invite the proverbial fox into the henhouse. The experienced expert could simply 'lie in wait' so as to express his genuine opinions only after plaintiff discloses hers." *Keener*, 181 F.R.D. at 641.

Although Rule 26 requires that expert disclosures be complete, "there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. . . . Otherwise, if the expert needed to anticipate and rebut every possible criticism, expert witness practice would become even more expensive and unwieldy." *Allgood v. General Motors Corp*., 2006 WL 2669337, *5 (S.D. Ind. 2006); *Wilson Road Dev. Corp. v. Fronabarger Concreters, Inc*., 971 F. Supp. 2d 896, 903 (E.D. Mo. 2013) (denying motion to strike expert declarations "that merely

expand upon or clarify initial opinions that the defendants had an opportunity to test during discovery."); *c.f. Friebel v. Paradise Shores of Bay County, LLC*, 2011 WL 2420230, *2 (N.D. Fla. 2011) (granting motion to strike expert's supplemental report that contained information that "was not a natural extension of the [initial] report").

Here, the record reflects that Plaintiffs timely disclosed Dr. Parsons as an expert and provided his initial expert report within the deadline established by the Court's Scheduling Order. Dkt. 33. When Dr. Mortimer later purportedly mischaracterized Dr. Parsons' report in his Response to Plaintiffs' Motion to Amend, Plaintiffs filed the Declaration to clarify Dr. Parsons' opinion and respond to Dr. Mortimer's criticism. Dkt. 65-1. The Court has examined Dr. Parson's expert report and his Declaration, and concludes the majority of the Declaration is not "a dramatic, pointed variation" from his expert report. *Keener*, 181 F.R.D. at 641. Instead, most of the information contained in the Declaration falls within the scope of Dr. Parsons' expert report.

Specifically, in his Response to the Motion to Amend, Dr. Mortimer suggested Dr. Parsons cited certain treatises in his expert report to "support the conclusion that Dr. Mortimer's action further complicated an already ethically and morally complicated procedure." Dkt. 61, at 5. The Declaration clarifies that Dr. Parsons did not reach the aforementioned conclusion in his report based on such treatises, and that Dr. Parsons instead referenced such materials solely with respect to his discussion of the ethical implications of payment in exchange for donor semen, not the ethical implication of Dr. Mortimer's conduct in general. Dkt. 65-1, ¶ 3. Dr. Parsons' explanation is not new, but

merely responds to Dr. Mortimer's incorrect assumption regarding the relevance of certain materials cited in Dr. Parsons' expert report.

Next, Dr. Parsons addresses Dr. Mortimer's claim that "Dr. Parsons' primary critique is Dr. Mortimer's actions prevented anonymity between the donor and Plaintiffs." Dkt. 61, at 9. Dr. Parsons clarifies in the Declaration that this is not an accurate characterization of his report or opinion, and that Dr. Mortimer's overall conduct represented an "extreme deviation from the standard of care." Dkt. 65-1, at ¶ 4, ll. 16-19; ¶ 5. The Court can see for itself that Dr. Mortimer's characterization of Dr. Parsons' expert report is inaccurate, as, beyond preventing anonymity, the report references seven additional ways Dr. Mortimer's conduct deviated from the applicable standard of care. Dkt. 63-4, Ex. B at 2-4. Further, in light of such significant deviation, the Court views Dr. Parsons' statement in his Declaration that Dr. Mortimer's conduct was an "extraordinary deviation" from the applicable standard as a permissible, "natural extension" of the initial disclosure. *Star Ins. Co. v. Iron Horse Tools, Inc.*, 2018 WL 3079493, at *6 (D. Mont. 2018).

Similarly, Dr. Mortimer contends there is "a material and substantial difference between a breach of the applicable standard of care and a 'gross' or 'extreme' deviation from the standard of care," and suggests he would have retained an expert to dispute Dr. Parsons' conclusions had he known Dr. Parsons had concluded his breach was "extreme." Dkt. 66-1, at 6-7. The Idaho Courts have identified five factors to consider in determining whether a defendant's conduct is an "extreme" deviation from reasonable standards of conduct: (1) the presence of expert testimony; (2) whether the unreasonable conduct

actually caused harm to the plaintiff; (3) whether there is a special relationship between the parties; (4) proof of a continuing course of oppressive conduct; and (5) proof of the defendant's knowledge of the likely consequences of the conduct. *Thurston Enterprises, Inc. v. Safeguard Business Sys.*, 435 P.3d 489, 505 (Idaho 2019) (citing *Cuddy Mountain Concrete Inc. v. Citadel Constr., Inc.*, 824 P.2d 151, 160-61 (Idaho Ct. App. 1992)).

Here, Plaintiffs provided an expert report, the report recognized the harm caused by Dr. Mortimer's conduct,[16] the report concluded that there was a special relationship between Dr. Mortimer, as a physician, and Ashby and Fowler, as his patients, which required Dr. Mortimer to act in accordance with the applicable standard of care,[17] the report noted Dr. Mortimer used his own semen to inseminate other patients—in addition to Ashby—without their knowledge or consent,[18] and the report addressed Dr. Mortimer's knowledge of the likely consequences of his conduct.[19] Such conclusions put Dr. Mortimer on notice that Dr. Parsons considered his breach to be "extreme." *Thurston*, 435 P.3d at 505. Dr. Mortimer could have hired his own expert or deposed Dr. Parsons to rebut such conclusions but chose not to do so. While Dr. Parsons did not use the exact word "extreme" in his report, the report explicitly detailed conduct which satisfies the standard for an

---

[16] *See, e.g.*, Dkt. 63-4, Ex. B at 2 (referencing the "emotional distress caused by [Dr. Mortimer's] actions. . . described in great detail in the depositions of Ashby, Fowler and Rowlette").

[17] *Id*. at 4.

[18] *Id*. at 4 (noting Dr. Mortimer testified in his deposition that Ashby's non-consensual "insemination is not the only instance, thereby implying that there are many other people potentially injured by similar damages").

[19] *Id*. at 2.

"extreme deviation" under Idaho law, and Dr. Parsons' clarification that he considers Dr. Mortimer's deviation to be extreme is within the scope of his initial report. *Star Ins. Co.*, 2018 WL 3079493, at *6.

Dr. Mortimer also suggests the Declaration is beyond the scope of the expert report because Dr. Parsons admitted in his report that familiarizing experts stated Dr. Mortimer simply used "bad judgment." Dkt. 66-1, at 7. Dr. Mortimer contends an "exercise in bad judgment is materially different from extremely deviant behavior." *Id*. Dr. Parsons' report merely stated in a footnote that Dr. Mortimer's colleagues "opined that while [he] was a 'likeable colleague,' he used 'bad judgment' by doing these inseminations with his own semen." Dkt. 63-4, Ex. B at 4 n. 1. However, the report also noted that Dr. Mortimer's colleagues confirmed "it was not within the standard of care, and was against the ethical practice of medicine, to use the doctor's semen to achieve a pregnancy in a patient, with or without the consent of the patient." *Id*. at 4. Dr. Parsons and the familiarizing experts he spoke to did not merely conclude Dr. Mortimer simply used "bad judgment," but also that he unethically breached the applicable standard of care. This conclusion further supports Dr. Parsons' clarification in his Declaration that Dr. Mortimer's breach was extreme.

The Court finds the majority of the Declaration responds to Dr. Mortimer's interpretation of Dr. Parsons' report, and, as such, does not amount the "sort of prohibited ambush by an expert" that would require striking the Declaration. *Allgood*, 2006 WL 2669337 at *5 (citing *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741-42 (7th Cir. 1998)). However, the Court does find limited aspects of the Declaration are different from, rather than supplemental to, the information contained in Dr. Parsons' expert report. Specifically,

while Dr. Parsons' report characterized Dr. Mortimer's conduct as a knowing and purposeful breach of the applicable standard of care, the Declaration goes further and suggests Dr. Mortimer's conduct was "outrageous, extremely deviant, repugnant," and "fraudulent, oppressive and disgusting."  Dkt. 65-1, at ¶ 11; ¶ 13.

There is a dramatic distinction between the measured critique of Dr. Mortimer's conduct contained in Dr. Parsons' expert report and the vehement assault launched in the Declaration through the aforementioned language. An expert cannot supplement a previously produced expert report when the supplement is "substantially different" from the original report, or when the attempt to supplement is intended to "deepen" and "strengthen" the original report. *Lindner*, 249 F.R.D. at 649. Further, expert testimony is not admissible when it will serve "little purpose" other than to inflame the jury. *United States v. Cerna*, 2010 WL 11627594, at *10 (N.D. Cal. 2010) (holding whatever meaningful probative value lurked in an expert's inflammatory proffer was outweighed by substantial danger of unfair prejudice.) The Court accordingly finds the following portions of the Declaration previously undisclosed and inappropriate: Dkt. 65-1, at ¶ 11, ll. 20-25; ¶ 13.

If a party fails to comply with the rules regarding expert witnesses under Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The Ninth Circuit has stated the following factors should be considered when determining whether a violation of the expert discovery rules is harmless: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability

of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith of willfulness involved in not disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 713 (9th Cir. 2010).

Plaintiffs suggest that even if the content of Dr. Parsons' Declaration constitutes an undisclosed expert opinion, the inclusion of such content is harmless because any alleged prejudice could be cured by allowing Dr. Mortimer additional time to disclose an expert. Dkt. 70, 6-7. Plaintiffs note trial has not been set, and that they are willing to allow Dr. Mortimer to obtain a rebuttal expert opinion. *Id*. at 7. Dr. Mortimer counters untimely disclosure of expert testimony is not harmless simply because there is time to reopen expert testimony, and notes reopening discovery would require additional briefing, motion practice, and significant expense. Dkt. 71 at 6-7. The Court agrees. As the Ninth Circuit explained in *Goodman v. Staples, The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011), an untimely disclosure of expert testimony is not harmless where, as here, the opposing party has relied on the non-disclosure in preparing its defense. The Court accordingly finds allowing the portions of the Declaration which newly and aggressively characterize Dr. Mortimer's conduct as "outrageous, extremely deviant, repugnant," and "fraudulent, oppressive and disgusting," would not be harmless, and strikes these limited portions of the Declaration.

## V. CONCLUSION

As the parties are aware, the Court has wrestled with the legal and ethical implications of this case since its inception. While this opinion may be perceived as an indictment on Dr. Mortimer and his conduct, the Court instead concludes that Plaintiffs

have established there are genuine issues of material fact which preclude summary judgment on their medical malpractice claim. Similarly, there is substantial evidence to support submitting the issue of punitive damages to the jury. Ultimately, the issues discussed herein, and Dr. Mortimer's liability for his conduct, present factual questions that are appropriately decided by a jury.

///

///

///

## VI. ORDER

**IT IS ORDERED:**

1. Dr. Mortimer's Motion for Summary Judgment (Dkt. 49) is **DENIED**.

2. OGA's Motion for Summary Judgment (Dkt. 50) is **GRANTED** and OGA is **DISMISSED** as a Defendant in this suit.

3. Plaintiffs' Motion to Amend Complaint to Include Prayer for Punitive Damages (Dkt. 53) is **GRANTED**.

4. Dr. Mortimer's Motion to Strike (Dkt. 66) is **GRANTED in part and DENIED in part**.

5. Plaintiffs' Motion for Summary Judgment (Dkt. 72) is **GRANTED**.

6. Within fourteen (14) days of the date of this Order, the parties shall submit their **unavailable** trial dates starting in April, 2020, and also state how many days they believe it will take to try this matter. The Court will then enter a

separate Trial Order that sets forth the trial date and various other pretrial deadlines.

DATED: February 5, 2020

_____
David C. Nye
Chief U.S. District Court Judge